**LeClairRyan**
*A Professional Corporation*
One Riverfront Plaza
1037 Raymond Boulevard
Newark, New Jersey 07102
(973) 491-3600
Attorneys for Plaintiff, Days Inns Worldwide, Inc.

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| DAYS INNS WORLDWIDE, INC., a Delaware Corporation, | : |
| | : |
| Plaintiff, | : Civil Action No. 17- |
| | : |
| v. | : **COMPLAINT** |
| | : |
| KK SANKAR MAHADEV CORPORATION, a Missouri Corporation; SHAILESH KUMAR, an individual; KEITH PARKER, an individual; and BHAVIKA PATEL, an individual, | : |
| | : |
| | : |
| Defendants. | : |

Plaintiff Days Inns Worldwide, Inc., by its attorneys, LeClairRyan, complaining of defendants, KK Sankar Mahadev Corporation, Shailesh Kumar, Keith Parker, and Bhavika Patel, says:

### PARTIES, JURISDICTION AND VENUE

1.      Plaintiff Days Inns Worldwide, Inc. ("DIW") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Parsippany, New Jersey.

2.      Defendant KK Sankar Mahadev Corporation ("KKSM"), on information and belief, is a corporation existing under the laws of the State of Missouri, with its principal place of business at 7100 Northeast Parvin Road, Kansas City, Missouri 64117.

DIW 17633 - Complaint(rev):19857843_1

3.      Defendant Shailesh Kumar ("Kumar"), on information and belief, is a shareholder of KKSM and a citizen of the State of Missouri, having an address at 7100 Northeast Parvin Road, Kansas City, Missouri 64117.

4.      Defendant Keith Parker ("Parker"), on information and belief, is a shareholder of KKSM and a citizen of the State of Missouri, having an address at 7100 Northeast Parvin Road, Kansas City, Missouri 64117.

5.      Defendant Bhavika Patel ("Patel"), on information and belief, is a shareholder of KKSM and a citizen of the State of Missouri, having an address at 7100 Northeast Parvin Road, Kansas City, Missouri 64117.

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 inasmuch as the plaintiff and all the defendants are citizens of different states and the amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of $75,000.

7.      This Court has personal jurisdiction over KKSM by virtue of, among other things, section 17.6.3 of the January 5, 2006 license agreement by and between KKSM and DIW (the "License Agreement"), described in more detail below, pursuant to which KKSM has consented "to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey . . . ."

8.      This Court has personal jurisdiction over Kumar, Parker, and Patel by virtue of, among other things, the terms of a Guaranty (the "Guaranty"), described in more detail below, pursuant to which Kumar, Parker, and Patel acknowledged that they were personally bound by section 17 of the License Agreement.

9.     Venue is proper in this District pursuant to section 17.6.3 of the License Agreement, inasmuch as that provision contains an express waiver by KKSM of any objection to venue in this District.

## ALLEGATIONS COMMON TO ALL COUNTS

### The Agreements Between The Parties

10.     On or about January 5, 2006, DIW entered into the License Agreement with KKSM for the operation of a 86-room Days Inn® guest lodging facility located at 7100 Northeast Parvin Road, Kansas City, Missouri 64117, designated as Site No. 17633-60576-01 (the "Facility").  A true copy of the License Agreement is attached hereto as Exhibit A.

11.     Pursuant to section 5 of the License Agreement, KKSM was obligated to operate a Days Inn® guest lodging facility for a fifteen-year term.

12.     Pursuant to section 7, section 18.1, section 18.9[1], and Schedule C of the License Agreement, KKSM was required to make certain periodic payments to DIW for royalties, system assessment fees, taxes, interest, reservation system user fees, and other fees (collectively, "Recurring Fees").

13.     Pursuant to section 7.3 of the License Agreement, KKSM agreed that interest is payable "on any past due amount payable to [DIW] under this [License] Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid."

14.     Pursuant to section 3.8 of the License Agreement, KKSM was required to prepare and submit monthly reports to DIW disclosing, among other things, the amount of gross room

_____

[1] By amendment dated May 13, 2015, a true copy which is attached hereto as Exhibit B, the parties amended the License Agreement to include Section 18.9.

3

revenue earned by KKSM at the Facility in the preceding month for purposes of establishing the amount of royalties and other Recurring Fees due to DIW.

15.     Pursuant to section 3.8 of the License Agreement, KKSM agreed to maintain at the Facility accurate financial information, including books, records, and accounts, relating to the gross room revenue of the Facility and, pursuant to sections 3.8 and 4.8 of the License Agreement, KKSM agreed to allow DIW to examine, audit, and make copies of the entries in these books, records, and accounts.

16.     Pursuant to section 11.2 of the License Agreement, DIW could terminate the License Agreement, with notice to KKSM, if KKSM (a) discontinued operating the Facility as a Days Inn® guest lodging establishment, and/or (b) lost possession or the right to possession of the Facility.

17.     Pursuant to section 12.1 of the License Agreement, KKSM agreed that, in the event of a termination of the License Agreement pursuant to section 11.2, it would pay liquidated damages to DIW in accordance with a formula specified in the License Agreement.

18.     Section 18.7 of the License Agreement specifically set liquidated damages for the Facility at $1,000.00 for each guest room of the Facility KKSM was authorized to operate at the time of termination.

19.     Pursuant to section 17.4 of the License Agreement, KKSM agreed that the non-prevailing party would "pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this [License] Agreement or collect amounts owed under this [License] Agreement."

20.     Effective as of the date of the License Agreement, Kumar, Parker, and Patel provided DIW with a Guaranty of KKSM's obligations under the License Agreement.  A true copy of the Guaranty is attached hereto as Exhibit C.

21.     Pursuant to the terms of the Guaranty, Kumar, Parker, and Patel agreed, among other things, that upon a default under the License Agreement, they would "immediately make each payment and perform or cause [KKSM] to perform, each unpaid or unperformed obligation of [KKSM] under the [License] Agreement."

22.     Pursuant to the terms of the Guaranty, Kumar, Parker, and Patel agreed to pay the costs, including reasonable attorneys' fees, incurred by DIW in enforcing its rights or remedies under the Guaranty or the License Agreement.

**The Termination of the License Agreement**

23.     By e-mail dated April 8, 2016, a true copy of which is attached as Exhibit D, KKSM notified DIW that it permanently ceased operating the Facility.

24.     By letter dated April 15, 2016, a true copy of which is attached as Exhibit E, DIW acknowledged KKSM's unilateral termination of the License Agreement, effective April 8, 2016, and advised KKSM that it was required to pay to DIW as liquidated damages for premature termination the sum of $86,000.00 as required under the License Agreement, and all outstanding Recurring Fees through the date of termination.

**FIRST COUNT**

25.     DIW repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 24 of the Complaint.

5

26.     Pursuant to sections 3.8 and 4.8 of the License Agreement, KKSM agreed to allow DIW to examine, audit, and make copies of KKSM's financial information, including books, records, and accounts, relating to the gross room revenue earned at the Facility.

27.     The calculation of the monetary amounts sought by DIW in this action is based on the gross room revenue information supplied to DIW by KKSM and, to the extent there has been non-reporting, DIW's estimate as to the gross room revenue earned by KKSM.

28.     The accuracy of this estimate cannot be ascertained without an accounting of the receipts and disbursements, profit and loss statements, and other financial materials, statements and books from KKSM.

**WHEREFORE**, DIW demands judgment ordering that KKSM account to DIW for any and all revenue derived as a result of marketing, promoting, or selling guest lodging services at the Facility from the inception through the date of termination of the License Agreement.

## SECOND COUNT

29.     DIW repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 28 of the Complaint.

30.     By letter dated April 15, 2016, DIW acknowledged KKSM's unilateral termination of the License Agreement, effective April 8, 2016.

31.     Section 12.1 of the License Agreement provides that, in the event of termination of the License Agreement due to action of the Licensee, KKSM shall pay liquidated damages to DIW within 30 days of termination.

32.     Section 18.7 of the License Agreement set liquidated damages for the Facility at $1,000.00 multiplied by the number of guest rooms KKSM was authorized to operate at the Facility at the time of termination.  At the time of termination, KKSM was authorized to operate

6

86 guest rooms at the Facility.  Accordingly, the amount of liquidated damages due and owing from KKSM is $86,000.00.

33.     As a result of the termination of the License Agreement, KKSM is obligated to pay DIW liquidated damages in the amount of $86,000.00, as calculated pursuant to sections 12.1 and 18.7 of the License Agreement.

34.     Notwithstanding DIW's demand for payment, KKSM has failed to pay DIW the liquidated damages as required in sections 12.1 and 18.7 of the License Agreement.

35.     DIW has been damaged by KKSM's failure to pay liquidated damages.

**WHEREFORE**, DIW demands judgment against KKSM for liquidated damages in the amount of $86,000.00, together with interest, attorneys' fees, and costs of suit.

<u>**THIRD COUNT**</u>

36.     DIW repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 35 of the Complaint.

37.     By virtue of the premature termination of the License Agreement, DIW sustained a loss of future revenue over the remainder of the fifteen-year term of the License Agreement.

38.     If the Court determines that KKSM is not liable to pay DIW liquidated damages as required by sections 12.1 and 18.7 of the License Agreement then, in the alternative, KKSM is liable to DIW for actual damages for the premature termination of the License Agreement.

39.     DIW has been damaged by KKSM's breach of its obligation to operate a Days Inn® guest lodging facility for the remaining term of the License Agreement.

**WHEREFORE**, DIW demands judgment against KKSM for actual damages in an amount to be determined at trial, together with interest, attorneys' fees, and costs of suit.

## FOURTH COUNT

40.      DIW repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 39 of the Complaint.

41.      Pursuant to section 7, section 18.1, section 18.9, and Schedule C of the License Agreement, KKSM was obligated to remit Recurring Fees to DIW.

42.      Despite its obligation to do so, KKSM failed to remit certain of the Recurring Fees due and owing under the License Agreement, in the current amount of $30,448.82.

43.      KKSM's failure to remit the agreed Recurring Fees constitutes a breach of the License Agreement and has damaged DIW.

**WHEREFORE**, DIW demands judgment against KKSM for the Recurring Fees due and owing under the License Agreement, in the current amount of $30,448.82, together with interest, attorneys' fees, and costs of suit.

## FIFTH COUNT

44.      DIW repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 43 of the Complaint.

45.      At the time of the termination of the License Agreement, KKSM was obligated to pay DIW Recurring Fees.

46.      Despite its obligation to do so, KKSM failed to pay certain of the Recurring Fees due and owing under the License Agreement, in the current amount of $30,448.82.

47.      KKSM's failure to compensate DIW constitutes unjust enrichment and has damaged DIW.

**WHEREFORE**, DIW demands judgment against KKSM for the Recurring Fees due and owing under the License Agreement, in the current amount of $30,448.82, together with interest, attorneys' fees, and costs of suit.

<u>SIXTH COUNT</u>

48.     DIW repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 47 of the Complaint.

49.     Pursuant to the terms of the Guaranty, Kumar, Parker, and Patel agreed, among other things, that upon a default under the License Agreement, they would immediately make each payment and perform each obligation required of KKSM under the License Agreement.

50.     Despite their obligation to do so, Kumar, Parker, and Patel failed to make any payments or perform or cause KKSM to perform each obligation required under the License Agreement.

51.     Pursuant to the Guaranty, Kumar, Parker, and Patel are liable to DIW for KKSM's liquidated damages in the amount of $86,000.00, or actual damages in an amount to be determined at trial, and KKSM's Recurring Fees due and owing under the License Agreement, in the current amount of $30,448.82.

**WHEREFORE**, DIW demands judgment against Kumar, Parker, and Patel for all liquidated damages, or actual damages, and Recurring Fees due and owing under the License Agreement, together with interest, attorneys' fees, and costs of suit.

LeClairRyan
Attorneys for Plaintiff
Days Inns Worldwide, Inc.

By: _____
**Bryan P. Couch**

Dated: 1/27/17

9

## <u>CERTIFICATION PURSUANT TO L. CIV. R. 11.2</u>

I certify that, to the best of my knowledge, this matter is not the subject of any other action pending in any court or of any pending arbitration or administrative proceeding.

**LeClairRyan**
Attorneys for Plaintiff
Days Inns Worldwide, Inc.

By: _____
    **Bryan P. Couch**

Dated: 1/27/17

# EXHIBIT A

Location: KANSAS CITY, MO
Entity No: 60576
Unit No.: 17633

**DAYS INNS WORLDWIDE, INC.**
**LICENSE AGREEMENT**

THIS LICENSE AGREEMENT ("Agreement"), dated Jan 5 , 200 6 , is between **DAYS INNS WORLDWIDE, INC.**, a Delaware corporation ("we", "our", or "us"), and KK SANKAR MAHADEV CORPORATION, a MO corporation ("you"). The definitions of capitalized terms are found in Appendix A. In consideration of the following mutual promises, the parties agree as follows:

**1. License.** We have the exclusive right to license and franchise to you the distinctive "Days Inn" System for providing transient guest lodging services. We grant to you and you accept the License, effective and commencing on the Opening Date and ending on the earliest to occur of the Term's expiration or a Termination. You will call the Facility a "Days Inn." You may adopt additional or secondary designations for the Facility with our prior written consent, which we may withhold, condition, or withdraw on written notice in our sole discretion. You shall not affiliate or identify the Facility with another franchise system, reservation system, brand, cooperative or registered mark during the Term.

**2. Days Inns Licensee Advisory Association.** You will be eligible to participate in the Days Inn Licensee Advisory Association, a Delaware corporation that is the organization of Days Inn System licensees, in accordance with the Bylaws and Certificate of Incorporation of the Association, as amended, so long as you are not in default under this Agreement.

**3. Your Improvement and Operating Obligations.** Your obligations to improve, operate and maintain the Facility are:

3.1 **Improvements.** You must select and acquire the Location and acquire, equip and supply the Facility in accordance with System Standards. You must provide us with proof that you own or lease the Facility before or within 30 days after the Effective Date. You must begin renovation of the Facility no later than thirty (30) days after the Effective Date. The deadline for completing the pre-opening phase of conversion and renovation, when the Facility must score 200 or fewer points under our quality assurance inspection system (or equivalent score under a successor quality assurance scoring system we employ), and be ready to open for business under the System, is ninety (90) days after the Effective Date. All renovations will comply with System Standards, any Approved Plans and any Punch List attached to this Agreement. Your general contractor or you must carry the insurance required under this Agreement during renovation. You must complete the pre-opening renovation specified on the Punch List and the Facility must pass its pre-opening quality assurance inspection with a score of 200 or fewer points (or equivalent score under a successor quality assurance scoring system we employ), before we consider the Facility to be ready to open under the System. You must continue renovation and improvement of the Facility after the Opening Date if the Punch List so requires. We may, in our sole discretion, terminate this Agreement by giving written notice to you

1

(subject to applicable law) if (1) you do not commence or complete the pre-opening or post-opening improvements of the Facility by the dates specified in this Section, or (2) you prematurely identify the Facility as a Chain Facility or begin operation under the System name described in Schedule B in violation of Section 3.3 and you fail to either complete the pre-opening Improvement Obligation or cease operating and/or identifying the Facility under the Marks and System within five days after we send you written notice of default. Time is of the essence for the Improvement Obligation. We may, however, in our sole discretion, grant one or more extensions of time to perform any phase of the Improvement Obligation. You will pay us a non-refundable extension fee of $2.00 per room for each day of any extension of the deadline for completing pre-opening improvements. This fee will be payable to us after each 30 days of the extension. You will pay us the balance of the extension fee outstanding when the Facility opens under the System 10 days after the Opening Date. The grant of an extension will not waive any other default existing at the time the extension is granted.

3.2 **Improvement Plans.** You will create plans and specifications for the work described in Section 3.1 (based upon the System Standards and this Agreement) if we so request and submit them for our approval before starting improvement of the Location. We will not unreasonably withhold or delay our approval, which is intended only to test compliance with System Standards, and not to detect errors or omissions in the work of your architects, engineers, contractors or the like. Our review does not cover technical, architectural or engineering factors, or compliance with federal, state or local laws, regulations or code requirements. We will not be liable to your lenders, contractors, employees, guests, others, or you on account of our review or approval of your plans, drawings or specifications, or our inspection of the Facility before, during or after renovation or construction. Any material variation from the Approved Plans requires our prior written approval. You will promptly provide us with copies of permits, job progress reports, and other information as we may reasonably request. We may inspect the work while in progress without prior notice.

3.3 **Pre-Opening.** You may identify the Facility as a Chain Facility prior to the Opening Date, or commence operation of the Facility under a Mark and using the System, only after first obtaining our approval or as permitted under and strictly in accordance with the System Standards Manual. If you identify the Facility as a Chain Facility or operate the Facility under a Mark before the Opening Date without our express written consent, then in addition to our remedies under Sections 3.1 and 11.2, you will begin paying the Royalty to us, as specified in Section 7.1, from the date you identify or operate the Facility using the Mark. We may delay the Opening Date until you pay the Royalty accruing under this Section.

3.4 **Operation.** You will operate and maintain the Facility continuously after the Opening Date on a year-round basis as required by System Standards and offer transient guest lodging and other related services of the Facility (including those specified on Schedule B) to the public in compliance with the law and System Standards. You will keep the Facility in a clean, neat, and sanitary condition. You will clean, repair, replace, renovate, refurbish, paint, and redecorate the Facility and its FF&E as and when needed to comply with System Standards. The Facility will accept payment from guests by all credit and debit cards we designate in the System Standards Manual. You may add to or discontinue the amenities, services and facilities described in Schedule B, or lease or subcontract any service or portion of the Facility, only with our prior

written consent which we will not unreasonably withhold or delay. Your front desk operation, telephone system, parking lot, swimming pool and other guest service facilities may not be shared with or used by guests of another lodging or housing facility.

3.5 **Training.** You, or a person with executive authority if you are an entity, and the Facility's general manager (or other representative who exercises day to day operational authority) will attend the training programs described in Section 4.1 we designate as mandatory for licensees or general managers, respectively. You will train or cause the training of all Facility personnel as and when required by System Standards and this Agreement. You will pay for all travel, lodging, meals and compensation expenses of the people you send for training programs, the cost of training materials and other reasonable charges we may impose for training under Section 4.1.

3.6 **Marketing.** You will participate in System marketing programs, including the Directory and the Reservation System. You will obtain and maintain the computer and communications service and equipment we specify to participate in the Reservation System. You will comply with our rules and standards for participation, and will honor reservations and commitments to guests and travel industry participants. You authorize us to offer and sell reservations for rooms and services at the Facility according to the rules of participation and System Standards. You may implement, at your option and expense, your own local advertising. Your advertising materials must use the Marks correctly, and must comply with System Standards or be approved in writing by us prior to publication. You will stop using any non-conforming, out-dated or misleading advertising materials if we so request.

3.6.1 You may participate in any regional marketing, training or management alliance or cooperative of Chain licensees formed to serve the Chain Facilities in your area. We may assist the cooperative collect contributions. You may be excluded from cooperative programs and benefits if you don't participate in all cooperative programs according to their terms, including making payments and contributions when due.

3.6.2 The Facility must participate in our Chain-wide Internet marketing activities like other marketing programs. You shall provide us with information and photographs of the Facility in accordance with System Standards for posting on the Chain website. The content you provide us or use yourself for any Internet marketing must be true, correct and accurate, and you will notify us in writing promptly when any correction to the content becomes necessary. You shall promptly modify at our request the content of any Internet marketing material for the Facility you use, authorize, display or provide to conform to System Standards. You will discontinue any Internet marketing that conflicts, in our reasonable discretion, with Chain-wide Internet marketing activities. You must honor the terms of any participation agreement you sign for Internet marketing. You shall pay when due any fees, commissions, charges and reimbursements relating to Internet marketing activities (i) in which you agree to participate, or (ii) that we designate as mandatory on a Chain-wide basis, provided that the activities carry aggregate fees per transaction of not more than the sum of the full agent commission specified on Schedule C for sales agents, plus 10% of the Chain's reported average daily rate for the preceding calendar year. We may suspend the Facility's participation in Internet marketing activity if you default under this Agreement.

3

3.7  **Governmental Matters.**  You will obtain as and when needed all governmental permits, licenses and consents required by law to construct, acquire, renovate, operate and maintain the Facility and to offer all services you advertise or promote.  You will pay when due or properly contest all federal, state and local payroll, withholding, unemployment, beverage, permit, license, property, ad valorem and other taxes, assessments, fees, charges, penalties and interest, and will file when due all governmental returns, notices and other filings.  You will comply with all applicable federal, state and local laws, regulations and orders applicable to you and/or the Facility, including those combating terrorism such as the USA Patriot Act and Executive Order 13224.

3.8  **Financial Books & Records; Audits.**

3.8.1  The Facility's transactions must be timely and accurately recorded in accounting books and records prepared on an accrual basis compliant with generally accepted accounting principles of the United States ("GAAP") and consistent with the most recent edition of the Uniform System of Accounts for the Lodging Industry published by the American Hotel & Motel Association, as modified by this Agreement and System Standards.  You acknowledge that your accurate accounting for and reporting of Gross Room Revenues is a material obligation you accept under this Agreement.

3.8.2  We may notify you of a date on which we propose to audit the Facility's books and records.  You will be deemed to confirm our proposed date unless you follow the instructions with the audit notice for changing the date.  You need to inform us where the books and records will be produced.  You need to produce for our auditors at the confirmed time and place for the audit the books, records, tax returns and financial statements relating to the Facility for the applicable accounting periods we require under this Agreement and System Standards.  If our auditors must return to your location after the first date we confirm for the audit because you violate this Section 3.8.2 or refuse to cooperate with the reasonable requests of our auditors, you must pay us the Audit Fee under Section 4.8 when invoiced.  We may also perform an audit of the Facility's books and records without advance notice.  Your staff must cooperate with and assist our auditors to perform any audit we conduct.

3.8.3  We will notify you in writing if you default under this Agreement because (i) you do not cure a violation of Section 3.8.2 within 30 days after the date of the initial audit, (ii) you cancel 2 or more previously scheduled audits, (iii) you refuse to admit our auditors for an audit during normal business hours at the place where you maintain the Facility's books and records, or refuse to produce the books and records required under this Agreement and System Standards for the applicable accounting periods, (iv) our audit determines that the books and records you produced are incomplete or show evidence of tampering or violation of generally accepted internal control procedures, or (v) our audit determines that that you have reported to us less than 97% of the Facility's Gross Room Revenues for any fiscal year preceding the audit.  Our notice of default may include, in our sole discretion and as part of your performance needed to cure the default under this Section 3.8, an "Accounting Procedure Notice."  You must also pay any deficiency in Recurring Fees or other charges we identify and invoice as a result of the audit.  The Accounting Procedure Notice requires that you obtain and deliver to us, within 90 days after the end of each of your next three fiscal years ending after the Accounting Procedure Notice, an

4

audit opinion signed by an independent certified public accountant who is a member of the American Institute of Certified Public Accountants addressed to us that the Facility's Gross Room Revenues you reported to us during the fiscal year fairly present the Gross Room Revenues of the Facility computed in accordance with this Agreement for the fiscal year.

**3.9 Inspections.** You acknowledge that the Facility's participation in our quality assurance inspection program (including unannounced inspections) is a material obligation you accept under this Agreement. You will permit our representatives to perform quality assurance inspections of the Facility at any time with or without advance notice. The inspections will commence during normal business hours although we may observe Facility operation at any time. You and the Facility staff will cooperate with the inspector performing the inspection. If the Facility fails an inspection, you refuse to cooperate with our inspector, or you refuse to comply with our published inspection System Standards, then you will pay us when invoiced for any reinspection fee specified in System Standards Manuals (which is $750 on the Effective Date and will not exceed $2,500) plus the reasonable travel, lodging and meal costs our inspector incurs for a reinspection. We may also conduct paper and electronic customer satisfaction surveys of your guests and include the results in your final quality assurance score. We may publish and disclose the results of quality assurance inspections and guest surveys.

**3.10 Insurance.** You will obtain and maintain during the Term of this Agreement the insurance coverage required under the System Standards Manual from insurers meeting the standards established in the Manual. Unless we instruct you otherwise, your liability insurance policies will name Days Inns Worldwide, Inc., Cendant Hotel Group, Inc. and Cendant Corporation, their successors and assigns as additional insureds.

**3.11 Conferences.** You (or your representative with executive authority if you are an entity) will attend each annual Chain conference and pay the Conference Fee we set for the Chain licensees, if and when we determine to hold an annual Chain conference. Mandatory recurrent training for licensees and managers described in Section 4.1.3 may be held at a conference. The Fee will be the same for all Chain Facilities that we license in the United States. You will receive reasonable notice of a Chain conference.

**3.12 Purchasing.** You will purchase or obtain certain items we designate as proprietary or that bear or depict the Marks, such as signage, only from suppliers we approve. You may purchase other items for the Facility from any competent source you select, so long as the items meet or exceed System Standards.

**3.13 Good Will.** You will use reasonable efforts to protect, maintain and promote the name "Days Inn" and its distinguishing characteristics, and the other Marks. You will not permit or allow your officers, directors, principals, employees, representatives, or guests of the Facility to engage in conduct which is unlawful or damaging to the good will or public image of the Chain or System. You will participate in Chain-wide guest service and satisfaction guaranty programs we require in good faith for all Chain Facilities. You will follow System Standards for identification of the Facility and for you to avoid confusion on the part of guests, creditors, lenders, investors and the public as to your ownership and operation of the Facility, and the identity of your owners.

5

3.14   **Facility Modifications.**   You may materially modify, diminish or expand the Facility (or change its interior design, layout, FF&E, or facilities) only after you receive our prior written consent, which we will not unreasonably withhold or delay.   You will pay our Rooms Addition Fee then in effect for each guest room you add to the Facility.   If so request, you will obtain our prior written approval of the plans and specifications for any material modification, which we will not unreasonably withhold or delay.   You will not open to the public any material modification until we inspect it for compliance with the Approved Plans and System Standards.

3.15   **Courtesy Lodging.**   You will provide lodging at the "Employee Rate" established in the System Standards Manual from time to time (but only to the extent that adequate room vacancies exist) to our representatives traveling on business, but not more than three standard guest rooms at the same time.

3.16   **Minor Renovations.**   Beginning three years after the Opening Date, we may issue a "Minor Renovation Notice" to you that will specify reasonable Facility upgrading and renovation requirements (a "Minor Renovation") to be commenced no sooner than 60 days after the notice is issued, having an aggregate cost for labor, FF&E and materials estimated by us to be not more than the Minor Renovation Ceiling Amount.   You will perform the Minor Renovations as and when the Minor Renovation Notice requires.   We will not issue a Minor Renovation Notice within three years after the date of a prior Minor Renovation Notice, or if the three most recent quality assurance inspection scores of the Facility averaged no more than 200 points and the most recent quality assurance inspection score for the Facility was no more than 225 points (or equivalent scores under a successor quality assurance scoring system we employ), when the Facility is otherwise eligible for a Minor Renovation.

4.   **Our Operating and Service Obligations.**   We will provide you with the following services and assistance:

4.1   **Training.**   We may offer (directly or indirectly by subcontracting with an affiliate or a third party) general manager and owner orientation training, on-site opening training, remedial training and supplemental training.

4.1.1   **General Manager Orientation Training.**   We will offer at a location in the United States we designate a general manager orientation training program.   The program will not exceed two weeks in duration and will cover such topics as System Standards, services available from us, and operating a Chain Facility.   Your initial general manager (or other representative who exercises day to day operational authority) for the Facility must complete this program to our satisfaction no later than 90 days after the Opening Date.   If we do not offer a place in general manager orientation within that time frame, your general manager must attend the next program held at which we offer a place.   Any replacement general manager must complete general manager orientation to our satisfaction within 90 days after he/she assumes the position. If we do not offer a place in general manager orientation within that time frame, your replacement general manager must attend the next program held at which we offer a place. Your general manager for the Facility must complete general manager orientation even if you employ managers at other Chain Facilities who have already received this training. We charge you tuition of $1,100 for your first general manager if you open the Facility with our approval and your general manager completes general manager orientation within the

time period established under this Agreement. For any supplemental or replacement general manager, you must pay the tuition in effect for the program when your manager attends the program. You must also pay for your manager's travel, lodging, meals, incidental expenses, compensation and benefits. We may, at our option, automatically schedule your initial or replacement general manager for a class to be held within the required time period and invoice you when we notify you about the date of the class. If your general manager is unable to attend that class, you must notify us at least 15 days before the training start date and re-schedule the general manager for another class to be held within the 90 day period. If you fail to do so, we may charge you cancellation fees and/or enhanced tuition under Section 4.1.6.

**4.1.2 Owner Orientation Training.** We will offer an owner orientation training program to familiarize you with the System, the Chain, and our services. If this is your first System license, you (or a person with executive authority if you are an entity) must attend owner orientation preferably within 60 days before, but no later than 60 days after, the Opening Date. If we do not offer a place in owner orientation within this time period, you must attend the next program held at which we offer a place. Financial institutions and real estate mortgage investment conduits are exempt from the obligation to attend owner orientation, but may choose to do so at their option. We charge you tuition of $825 if you open the Facility with our approval and attend owner orientation within the time periods established under this Agreement. You must also pay for your travel, lodging, meal and incidental expenses. If you are unable to attend an orientation program that you have scheduled with us, you must notify us at least 15 days before the start date and schedule attendance at another class to be held within the 90 day period. If you fail to do so, we may charge you cancellation fees and/or enhanced tuition under Section 4.1.6.

**4.1.3 On-Site Opening Training.** We may provide and your staff must attend, if offered, on-site opening training (at our discretion as to length and scheduling) to assist you in opening the Facility. We currently do not charge tuition for this program, but may do so in the future. You will pay the cost of any site used if the Facility is not available and the rent for any equipment we need. You must provide lodging for our trainers at your expense. You must also pay, at our request, the reasonable travel, meal and out-of-pocket expenses incurred by our trainers for on-site opening training.

**4.1.4 Remedial Training.** We may require you, your general manager and/or your staff to participate in on-site remedial training if the Facility fails multiple quality assurance inspections and/or experiences significant complaints to our guest services department, as a condition to avoiding termination or to resumption of reservation service. You must pay the tuition in effect for this program when it is offered to you, and you must provide lodging for our trainers. Tuition for remedial on-site training must be paid before the training commences. The length of the remedial training could be up to five days, depending on the severity of the quality assurance and/or customer service issues.

**4.1.5 Supplemental Training.** You must subscribe to our e-learning training program which offers a variety of hospitality courses and videos for general managers and line level staff. We currently charge an annual training resource access fee of $150, which is subject to increase in the future. We may offer other mandatory or optional training programs for reasonable tuition or without charge. This training could be offered in our U.S. training center or other locations or held in conjunction

7

with a Chain lodging conference. You will pay for your representative's travel, lodging, meals, incidental expenses, compensation and benefits and any tuition charge we establish for this training. We may offer, rent or sell to you video tapes, computer discs or other on-site training aids and materials, or require you to buy them at reasonable prices. We may also offer Internet-based training via the Chain's intranet website.

**4.1.6 Enhanced Tuition and Cancellation Fees.** If you or your general manager do not attend orientation within the required time period, we may charge you tuition of up to 150% of the amount in effect for the program when you or your general manager attends the program, as disclosed in our Uniform Franchise Offering Circular ("UFOC") for new licensees. If you or any member of your staff cancels participation in any training program less than 15 days before it is scheduled to be held, or if you or the member fails to attend a training program as scheduled without notifying us in advance, we will charge you a cancellation fee of up to 100% of the tuition for the program. The cancellation fee is non-refundable and you will also be charged the full tuition in effect for the program when you reschedule the training.

**4.2    Reservation System.** We will operate and maintain (directly or by subcontracting with an affiliate or one or more third parties) a computerized Reservation System or such technological substitute(s) as we determine, in our discretion. We will use the Basic Service Charge for the acquisition, development, support, equipping, maintenance, improvement and operation of the Reservation System. We will provide software maintenance for the software we license to you to connect to the Reservation System if you are up to date in your payment of Recurring Fees and all other fees you must pay under any other agreement with us or our affiliate. The Facility will participate in the Reservation System, commencing with the Opening Date for the balance of the Term. We have the right to provide reservation services to lodging facilities other than Chain Facilities or to other parties.

**4.3    Marketing.**

4.3.1 We will promote public awareness and usage of Chain Facilities by implementing advertising, promotion, publicity, market research and other marketing programs, training programs and related activities, and the production and distribution of Chain publications and directories of hotels. We will determine in our discretion: (i) The nature and type of media placement; (ii) The allocation (if any) among international, national, regional and local markets; and (iii) The nature and type of advertising copy, other materials and programs. We or an affiliate may be reimbursed for the reasonable direct and indirect costs, overhead or other expenses of providing marketing services. We are not obligated to supplement or advance funds available from System licensees to pay for marketing activities. We do not promise that the Facility or you will benefit directly or proportionately from marketing activities.

4.3.2 We may, at our discretion, implement special international, national, regional or local promotional programs (which may or may not include the Facility) and may make available to you (to use at your option) media advertising copy and other marketing materials for prices which reasonably cover the materials' direct and indirect costs.

4.3.3 We will publish the Chain Directory. We will include the Facility in the Chain Directory after

8

it opens if you submit the information we request on time, and you are not in default under this Agreement at the time we must arrange for publication. We will supply Directories to you for display at locations specified in the System Standards Manual or policy statements. We may assess you a reasonable charge for the direct and indirect expenses (including overhead) of producing and delivering the Directories.

**4.4  Purchasing.** We may offer optional assistance to you with purchasing items used at or in the Facility. Our affiliates may offer this service on our behalf. We may restrict the vendors authorized to sell proprietary or Mark-bearing items in order to control quality, provide for consistent service or obtain volume discounts. We·will maintain and provide to you lists of suppliers approved to furnish Mark-bearing items, or whose products conform to System Standards.

**4.5  The System.** We will control and establish requirements for all aspects of the System. We may, in our discretion, change, delete from or add to the System, including any of the Marks or System Standards, in response to changing market conditions. We may, in our discretion, permit deviations from System Standards, based on local conditions and our assessment of the circumstances.

**4.6  Consultations and Standards Compliance.** We will assist you to understand your obligations under System Standards by telephone, mail, during quality assurance inspections, through the System Standards Manual, at training sessions and during conferences and meetings we conduct. We will provide telephone and mail consultation on Facility operation and marketing through our representatives. We will offer you access to any Internet website we may maintain to provide Chain licensees with information and services, subject to any rules, policies and procedures we establish for its use and access and to this Agreement. We may limit or deny access to any such website while you are in default under this Agreement.

**4.7  System Standards Manual and Other Publications.** We will specify System Standards in the System Standards Manual, policy statements or other publications. We will lend you one copy of the System Standards Manual promptly after we sign this Agreement. We will send you any System Standards Manual revisions and/or supplements as and when issued. We will send you all other publications for Chain licensees and all separate policy statements in effect from time to time.

**4.8  Inspections and Audits.** We have the unlimited right to conduct unannounced quality assurance inspections of the Facility and its operations, records and Mark usage to test the Facility's compliance with System Standards and this Agreement, and the audits described in Section 3.8. We have the unlimited right to re-inspect if the Facility does not achieve the score required on an inspection. We may impose a reinspection fee and will charge you for our costs as provided in Section 3.9. You will pay us an "Audit Fee" of $300.00 when we invoice you for an Audit Fee under Section 3.8. We may increase the Audit Fee on a Chain-wide basis to cover any increases in our audit costs to not more than $500.00, effective any time after December 31, 2005. Our inspections are solely for the purposes of checking compliance with System Standards.

**5.  Term.** The Term begins on the Effective Date and expires at the end of the fifteenth License Year. Some of your duties and obligations will survive termination or expiration of this Agreement. NEITHER PARTY HAS RENEWAL RIGHTS OR OPTIONS.

9

## 6. Initial Fees.

6.1  **Application and Initial Fees.** We should receive from you a non-refundable Application Fee of $1,000.00. You will pay us a non-refundable Initial Fee in the amount of $17,500.00, when you sign this Agreement, which is fully earned when we sign this Agreement.

6.2  **Initial Entry Charge.**

SECTION 6.2 INTENTIONALLY DELETED.

## 7. Recurring Fees, Taxes and Interest.

7.1  You will pay us certain "Recurring Fees" in U.S. dollars (or such other currency as we may direct if the Facility is outside the United States) ten days after the month in which they accrue, without billing or demand. Recurring Fees include the following:

7.1.1  A "Royalty" equal to five percent (5.0%) of Gross Room Revenues of the Facility accruing during the calendar month, accrues from the earlier of the Opening Date or the date you identify the Facility as a Chain Facility or operate it under a Mark until the end of the Term.

7.1.2  "System Assessment Fees," including a "Basic Service Charge" as set forth in Schedule C for advertising, marketing, training, the Reservation System and other related services and programs, and the specific additional charges and fees referred to in Schedule C or Section 4.2 of this Agreement as "Additional Charges," accrues from the Opening Date until the end of the Term, including during reservation suspension periods. We will allocate at least 39% of the Basic Service Charge to advertising, marketing and related services and programs. We reserve the right to increase or modify the System Assessment Fees for all Chain Facilities, and to add other fees and charges for new services, at our sole discretion as to amount or formula, from time to time, but with at least 30 days prior written notice and after consultation with the Days Inns Franchisee Advisory Association Board of Directors, by substituting a new Schedule C or otherwise, to reflect changes in the fully allocated costs of providing marketing and reservation services, and to add, drop or modify the types of services we offer. You will also pay or reimburse us for travel and other agent commissions paid for certain reservations at the Facility and a "GDS Fee" levied to pay for reservations for the Facility originated or processed through the Global Distribution System, the Internet and other reservation systems and networks. We may charge a reasonable service fee for this service. We, or our affiliates, may charge Facilities using the System outside the United States using a different formula.

7.2  You will pay to us "Taxes" equal to any federal, state or local sales, gross receipts, use, value added, excise or similar taxes assessed against us on the Recurring Fees by the jurisdictions where the Facility is located, but not including any income tax, franchise or other tax for the privilege of doing business by us in your State. You will pay Taxes to us when due.

7.3 "Interest" is payable when you receive our invoice on any past due amount payable to us under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid.

7.4 If a transfer occurs, your transferee or you will pay us our then current Application Fee and a "Relicense Fee" equal to the Initial Fee we would then charge a new licensee for the Facility.

## 8. Indemnifications.

8.1 Independent of your obligation to procure and maintain insurance, you will indemnify, defend and hold the Indemnitees harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by any Indemnitee for any investigation, claim, action, suit, demand, administrative or alternative dispute resolution proceeding, relating to or arising out of any transaction, occurrence or service at, or involving the operation of, the Facility, any payment you make or fail to make to us, any breach or violation of any contract or any law, regulation or ruling by, or any act, error or omission (active or passive) of, you, any party associated or affiliated with you or any of the owners, officers, directors, employees, agents or contractors of you or your affiliates, including when you are alleged or held to be the actual, apparent or ostensible agent of the Indemnitee, or the active or passive negligence of any Indemnitee is alleged or proven. You have no obligation to indemnify an Indemnitee for damages to compensate for property damage or personal injury if a court of competent jurisdiction makes a final decision not subject to further appeal that the Indemnitee engaged in willful misconduct or intentionally caused such property damage or bodily injury. This exclusion from the obligation to indemnify shall not, however, apply if the property damage or bodily injury resulted from the use of reasonable force by the Indemnitee to protect persons or property.

8.2 You will respond promptly to any matter described in the preceding paragraph, and defend the Indemnitee. You will reimburse the Indemnitee for all costs of defending the matter, including reasonable attorneys' fees, incurred by the Indemnitee if your insurer or you do not assume defense of the Indemnitee promptly when requested, or separate counsel is appropriate, in our discretion, because of actual or potential conflicts of interest. We must approve any resolution or course of action in a matter that could directly or indirectly have any adverse effect on us or the Chain, or could serve as a precedent for other matters.

8.3 We will indemnify, defend and hold you harmless, to the fullest extent permitted by law, from and against all Losses and Expenses incurred by you in any action or claim arising from your proper use of the System alleging that your use of the System and any property we license to you is an infringement of a third party's rights to any trade secret, patent, copyright, trademark, service mark or trade name. You will promptly notify us in writing when you become aware of any alleged infringement or an action is filed against you. You will cooperate with our defense and resolution of the claim. We may resolve the matter by obtaining a license of the property for you at our expense, or by requiring that you discontinue using the infringing property or modify your use to avoid infringing the rights of others.

11

**9. Your Assignments, Transfers and Conveyances.**

9.1 **Transfer of the Facility.** This Agreement is personal to you (and your owners if you are an entity). We are relying on your experience, skill and financial resources (and that of your owners and the guarantors, if any) to sign this Agreement with you. You may finance the Facility and grant a lien, security interest or encumbrance on it without notice to us or our consent. If a Transfer is to occur, the transferee or you must comply with Section 9.3. Your License is subject to termination when the Transfer occurs. The License is not transferable to your transferee, who has no right or authorization to use the System and the Marks when you transfer ownership or possession of the Facility. The transferee may not operate the Facility under the System, and you are responsible for performing the post-termination obligations in Section 13. You and your owners may, only with our prior written consent and after you comply with Sections 9.3 and 9.6, assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise. Transactions involving Equity Interests that are not Equity Transfers do not require our consent and are not Transfers.

9.2 **Public Offerings and Registered Securities.** You may engage in the first registered public offering of your Equity Interests only after you pay us a public offering fee equal to $15,000. Your Equity Interests (or those of a person, parent, subsidiary, sibling or affiliate entity, directly or indirectly effectively controlling you), are freely transferable without the application of this Section if they are, on the Effective Date, or after the public offering fee is paid, they become, registered under the federal Securities Act of 1933, as amended, or a class of securities registered under the Securities Exchange Act of 1934, as amended, or listed for trading on a national securities exchange or the automated quotation system of the National Association of Securities Dealers, Inc. (or any successor system), provided that any tender offer for at least a majority of your Equity Interests will be an Equity Transfer subject to Section 9.1.

9.3 **Conditions.** We may, to the extent permitted by applicable law, condition and withhold our consent to a Transfer when required under this Section 9 until the transferee and you meet certain conditions. If a Transfer is to occur, the transferee (or you, if an Equity Transfer is involved) must first complete and submit our Application, qualify to be a licensee in our sole discretion, given the circumstances of the proposed Transfer, provide the same supporting documents as a new license applicant, pay the Application and Relicense Fees then in effect, sign the form of License Agreement we then offer in conversion transactions and agree to renovate the Facility as if it were an existing facility converting to the System, as we reasonably determine. We will provide a Punch List of improvements we will require after the transferee's Application is submitted to us. We may require structural changes to the Facility if it no longer meets System Standards for entering conversion facilities, or in the alternative, condition our approval of the Transfer on one or more of the following: limit the transferee's term to the balance of your Term, add a right to terminate without cause exercisable by either party after a period of time has elapsed, or allow you to terminate the License when you sell the Facility and pay us Liquidated Damages under Section 12.1 at the same rate as you would pay if the termination occurred before the Opening Date. Such payment would be due and payable when you transfer possession of the Facility. We must also receive general releases from you and each of your owners, and payment of all amounts then owed to us and our affiliates by you, your owners, your affiliates, the transferee, its owners and affiliates, under this Agreement or otherwise. Our consent to the transaction will not be effective

12

until these conditions are satisfied.

**9.4  Permitted Transferee Transactions.**  You may transfer an Equity Interest or effect an Equity Transfer to a Permitted Transferee without obtaining our consent, renovating the Facility or paying a Relicense Fee or Application Fee.  No Transfer will be deemed to occur.  You also must not be in default and you must comply with the application and notice procedures specified in Sections 9.3 and 9.6.  Each Permitted Transferee must first agree in writing to be bound by this Agreement, or at our option, execute the License Agreement form then offered prospective licensees.  No transfer to a Permitted Transferee shall release a living transferor from liability under this Agreement or any guarantor under any Guaranty of this Agreement.  You must comply with this Section if you transfer the Facility to a Permitted Transferee.  A transfer resulting from a death may occur even if you are in default under this Agreement.

**9.5  Attempted Transfers.**  Any transaction requiring our consent under this Section 9 in which our consent is not first obtained shall be void, as between you and us.  You will continue to be liable for payment and performance of your obligations under this Agreement until we terminate this Agreement, all your financial obligations to us are paid and all System identification is removed from the Facility.

**9.6  Notice of Transfers.**  You will give us at least 30 days prior written notice of any proposed Transfer or Permitted Transferee transaction.  You will notify us when you sign a contract to Transfer the Facility and 10 days before you intend to close on the transfer of the Facility.  We will respond to all requests for our consent and notices of Permitted Transferee transactions within a reasonable time not to exceed 30 days.  You will notify us in writing within 30 days after a change in ownership of 25% or more of your Equity Interests that are not publicly held or that is not an Equity Transfer, or a change in the ownership of the Facility if you are not its owner.  You will provide us with lists of the names, addresses, and ownership percentages of your owner(s) at our request.

**10.  Our Assignments.**  We may assign, delegate or subcontract all or any part of our rights and duties under this Agreement, including by operation of law, without notice and without your consent.  We will have no obligations to you after you are notified that our transferee has assumed our obligations under this Agreement except those that arose before we assign this Agreement.

**11.  Default and Termination.**

**11.1  Default.**  In addition to the matters identified in Sections 3.1 and 3.8, you will be in default under this Agreement if (a) you do not pay us when a payment is due under this Agreement or any other instrument, debt, agreement or account with us related to the Facility, (b) you do not perform any of your other obligations when this Agreement and the System Standards Manual require, or (c) if you otherwise breach this Agreement.  If your default is not cured within ten days after you receive written notice from us that you have not filed your monthly report, paid us any amount that is due or breached your obligations regarding Confidential Information, or within 30 days after you receive written notice from us of any other default (except as noted below), then we may terminate this Agreement by written notice to you under Section 11.2.  We will not exercise our right to terminate if you have completely cured your default, or until any waiting period required by law has elapsed.  In the case of default resulting from the Facility's failure to meet Quality

13

Standards as measured by a quality assurance inspection, you must act diligently to cure the default and resolve health, safety, cleanliness and housekeeping failures identified in the inspection report within 30 days after the failing inspection. Within 90 days after the failing inspection, you must also cure the remaining items identified in the inspection report and renovate and improve the Facility to meet our then current System Standards for entering conversion properties (or other standards specified under System Standards if we are not then accepting conversions) to cure the default. At your request, we will determine and provide a written improvement plan to assist your efforts to cure the default.

**11.2   Termination.** We may terminate the License, or this Agreement if the Opening Date has not occurred, effective when we send written notice to you or such later date as required by law or as stated in the default notice, when (1) you do not cure a default as provided in Section 11.1 or we are authorized to terminate under Section 3.1, (2) you discontinue operating the Facility as a "Days Inn", (3) you do or perform, directly or indirectly, any act or failure to act that in our reasonable judgment is or could be injurious or prejudicial to the goodwill associated with the Marks or the System, (4) you lose possession or the right to possession of the Facility, (5) you (or any guarantor) suffer the termination of another license or License Agreement with us or one of our affiliates, (6) you intentionally maintain false books and records or submit a materially false report to us, (7) you (or any guarantor) generally fail to pay debts as they come due in the ordinary course of business, (8) you, any guarantor or any of your owners or agents misstated to us or omitted to tell us a material fact to obtain or maintain this Agreement with us, (9) you receive two or more notices of default from us in any one year period (whether or not you cure the defaults), (10) a violation of Section 9 occurs, or a Transfer occurs before the relicensing process is completed, (11) you or any of your Equity Interest owners contest in court the ownership or right to franchise or license all or any part of the System or the validity of any of the Marks, (12) you, any guarantor or the Facility is subject to any voluntary or involuntary bankruptcy, liquidation, dissolution, receivership, assignment, reorganization, moratorium, composition or a similar action or proceeding that is not dismissed within 60 days after its filing, or (13) you maintain or operate the Facility in a manner that endangers the health or safety of the Facility's guests.

**11.3  Casualty and Condemnation.**

**11.3.1**  You will notify us promptly after the Facility suffers a Casualty that prevents you from operating in the normal course of business, with less than 75% of guest rooms available. You will give us information on the availability of guest rooms and the Facility's ability to honor advance reservations. You will tell us in writing within 60 days after the Casualty whether or not you will restore, rebuild and refurbish the Facility to conform to System Standards and its condition prior to the Casualty. This restoration will be completed within 180 days after the Casualty. You may decide within the 60 days after the Casualty, and if we do not hear from you, we will assume that you have decided, to terminate this Agreement, effective as of the date of your notice or 60 days after the Casualty, whichever comes first. If this Agreement so terminates, you will pay all amounts accrued prior to termination and follow the post-termination requirements in Section 13. You will not be obligated to pay Liquidated Damages if the Facility will no longer be used as an extended stay or transient lodging facility after the Casualty.

**11.3.2**  You will notify us in writing within 10 days after you receive notice of any proposed

14

Condemnation of the Facility, and within 10 days after receiving notice of the Condemnation date. This Agreement will terminate on the date the Facility or a substantial portion is conveyed to or taken over by the condemning authority.

**11.4  Our Other Remedies.**  We may suspend the Facility from the Reservation System for any default or failure to pay or perform under this Agreement or any other written agreement with us relating to the Facility, discontinue Reservation System referrals to the Facility for the duration of such suspension, and may divert previously made reservations to other Chain Facilities after giving notice of non-performance, non-payment or default.  All Basic Service Charges accrue during the suspension period.  We may deduct points under our quality assurance inspection program for your failure to comply with this Agreement or System Standards.  Reservation service will be restored after you have fully cured any and all defaults and failures to pay and perform.  We may charge you, and you must pay as a condition precedent to restoration of reservation service, a Service Interruption Fee specified on Schedule C to reimburse us for our costs associated with service suspension and restoration.  We may omit the Facility from the Directory if you are in default on the date we must determine which Chain Facilities are included in the Directory.  You recognize that any use of the System not in accord with this Agreement will cause us irreparable harm for which there is no adequate remedy at law, entitling us to injunctive and other relief.  We may litigate to collect amounts due under this Agreement without first issuing a default or termination notice.  Our consent or approval may be withheld if needed while you are in default under this Agreement or may be conditioned on the cure of all your defaults.

**11.5  Your Remedies.**  If we fail to issue our approval or consent as and when required under this Agreement within a reasonable time of not less than 30 days after we receive all of the information we request, and you believe our refusal to approve or consent is wrongful, you may bring a legal action against us to compel us to issue our approval or consent to the obligation.  To the extent permitted by applicable law, this action shall be your exclusive remedy.  We shall not be responsible for direct, indirect, special, consequential or exemplary damages, including, but not limited to, lost profits or revenues.

## 12.  Liquidated Damages.

**12.1  Generally.**  If we terminate the License under Section 11.2, or you terminate this Agreement (except under Section 11.3 or as a result of our default which we do not cure within a reasonable time after written notice), you will pay us within 30 days following the date of termination, as Liquidated Damages, an amount equal to the sum of accrued Royalties and Basic Service Charges during the immediately preceding 24 full calendar months (or the number of months remaining in the unexpired Term (the "Ending Period") at the date of termination, whichever is less).  If the Facility has been open for fewer than 24 months, then the amount shall be the average monthly Royalties and Basic Service Charges since the Opening Date multiplied by 24.  You will also pay any applicable Taxes assessed on such payment and Interest calculated under Section 7.3 accruing from 30 days after the date of termination.  Before the Ending Period, Liquidated Damages will not be less than the product of $2,000 multiplied by the number of guest rooms you are then authorized to operate under Schedule B of this Agreement, as amended.  If we terminate this Agreement under Section 3 before the Opening Date, you will pay us within 10 days after you receive our notice of

15

termination Liquidated Damages equal to one-half the amount payable for termination under Section 11.2. Liquidated Damages are paid in place of our claims for lost future Recurring Fees under this Agreement. Our right to receive other amounts due under this Agreement is not affected.

**12.2   Condemnation Payments.** In the event a Condemnation is to occur, you will pay us the fees set forth in Section 7 for a period of one year after we receive the initial notice of condemnation described in Section 11.3.2, or until the Condemnation occurs, whichever is longer. You will pay us Liquidated Damages equal to the average daily Royalties and Basic Service Charges for the one year period preceding the date of your condemnation notice to us multiplied by the number of days remaining in the one year notice period if the Condemnation is completed before the one year notice period expires. This payment will be made within 30 days after Condemnation is completed (when you close the Facility or you deliver it to the condemning authority). You will pay no Liquidated Damages if the Condemnation is completed after the one year notice period expires, but you must pay the fees set forth in Section 7 when due until Condemnation is completed.

**13.   Your Duties At and After Termination.** When the License or this Agreement terminates for any reason whatsoever:

**13.1   System Usage Ceases.** You will immediately stop using the System to operate and identify the Facility. You will remove all signage and other items bearing any Marks and follow the other steps detailed in the System Standards Manual for changing the identification of the Facility. You will promptly paint over or remove the Facility's distinctive System trade dress, color schemes and architectural features. You shall not identify the Facility with a confusingly similar mark or name, or use the same colors as the System trade dress for signage, printed materials and painted surfaces. You will cease all Internet marketing using any Marks to identify the Facility.

**13.2   Other Duties.** You will pay all amounts owed to us under this Agreement within 10 days after termination. You will owe us Recurring Fees on Gross Room Revenues accruing while the Facility is identified as a "Days Inn", including Basic Service Charges for so long as the Facility receives service from the Reservation System. We may immediately remove the Facility from the Reservation System and divert reservations as authorized in Section 11.4. We may notify third parties that the Facility is no longer associated with the Chain. We may also, to the extent permitted by applicable law, and without prior notice enter the Facility and any other parcels, remove software (including archive and back-up copies) for accessing the Reservation System, all copies of the System Standards Manual, Confidential Information, equipment and all other personal property of ours, and paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that you have not removed or obliterated within five days after termination. You will promptly pay or reimburse us for our cost of removing such items, net of the $10.00 purchase price for signage. We will exercise reasonable care in removing or painting over signage. We will have no obligation or liability to restore the Facility to its condition prior to removing the signage. We shall have the right, but not the obligation, to purchase some or all of the Facility's Mark-bearing FF&E and supplies at the lower of their cost or net book value, with the right to set off their aggregate purchase price against any sums then owed us by you.

**13.3   Advance Reservations.** The Facility will honor any advance reservations, including group

16

bookings, made for the Facility prior to termination at the rates and on the terms established when the reservations are made and pay when due all related travel agent commissions.

**13.4 Survival of Certain Provisions.** Sections 3.8 (as to audits, for 2 years after termination), 3.13, 7 (as to amounts accruing through termination), 8, 11.4, 12, 13, 15, 16 and 17 survive termination of the License and this Agreement, whether termination is initiated by you or us, even if termination is wrongful.

**14. Your Representations and Warranties.** You expressly represent and warrant to us as follows:

**14.1 Quiet Enjoyment and Financing.** You own, or will own prior to commencing improvement, or lease, the Location and the Facility. You will be entitled to possession of the Location and the Facility during the entire Term without restrictions that would interfere with your performance under this Agreement, subject to the reasonable requirements of any financing secured by the Facility. You have, when you sign this Agreement, and will maintain during the Term, adequate financial liquidity and financial resources to perform your obligations under this Agreement.

**14.2 This Transaction.** You and the persons signing this Agreement for you have full power and authority and have been duly authorized, to enter into and perform or cause performance of your obligations under this Agreement. You have obtained all necessary approvals of your owners, Board of Directors and lenders. No executory franchise, license or affiliation agreement for the Facility exists other than this Agreement. Your execution, delivery and performance of this Agreement will not violate, create a default under or breach of any charter, bylaws, agreement or other contract, license, permit, indebtedness, certificate, order, decree or security instrument to which you or any of your principal owners is a party or is subject or to which the Facility is subject. Neither you nor the Facility is the subject of any current or pending merger, sale, dissolution, receivership, bankruptcy, foreclosure, reorganization, insolvency, or similar action or proceeding on the date you execute this Agreement and was not within the three years preceding such date, except as disclosed in the Application. You will submit to us the documents about the Facility, you, your owners and your finances that we request in the License Application (or after our review of your initial submissions) before or within 30 days after you sign this Agreement. To the best of your knowledge, neither you, your owners (if you are an entity), your officers, directors or employees or anyone else affiliated or associated with you, whether by common ownership, by contract, or otherwise, has been designated as, or is, a terrorist, a "Specially Designated National" or a "Blocked Person" under U.S. Executive Order 13224, in lists published by the U.S. Department of the Treasury's Office of Foreign Assets Control, or otherwise.

**14.3 No Misrepresentations or Implied Covenants.** All written information you submit to us about the Facility, you, your owners, any guarantor, or the finances of any such person or entity, was or will be at the time delivered and when you sign this Agreement, true, accurate and complete, and such information contains no misrepresentation of a material fact, and does not omit any material fact necessary to make the information disclosed not misleading under the circumstances. There are no express or implied covenants or warranties, oral or written, between we and you except as expressly stated in this Agreement.

**15. Proprietary Rights.**

17

DAYEXCI
186207.2 Q3/05

15.1 **Marks and System.** You will not acquire any interest in or right to use the System or Marks except under this Agreement. You will not apply for governmental registration of the Marks, or use the Marks or our corporate name in your legal name, but you may use a Mark for an assumed business or trade name filing.

15.2 **Inurements.** All present and future distinguishing characteristics, improvements and additions to or associated with the System by us, you or others, and all present and future service marks, trademarks, copyrights, service mark and trademark registrations used and to be used as part of the System, and the associated good will, shall be our property and will inure to our benefit. No good will shall attach to any secondary designator that you use.

15.3 **Other Locations and Systems.** We and our affiliates each reserve the right to own, in whole or in part, and manage, operate, use, lease, finance, sublease, franchise, license (as licensor or licensee), provide services to or joint venture (i) distinctive separate lodging or food and beverage marks and other intellectual property which are not part of the System, and to enter into separate agreements with you or others (for separate charges) for use of any such other marks or proprietary rights, (ii) other lodging, food and beverage facilities, or businesses, under the System utilizing modified System Standards, and (iii) a Chain Facility at or for any location outside the Protected Territory described in Section 17.8. You acknowledge that we are affiliated with or in the future may become affiliated with other lodging providers or franchise systems that operate under names or marks other than the Marks. We and our affiliates may use or benefit from common hardware, software, communications equipment and services and administrative systems for reservations, franchise application procedures or committees, marketing and advertising programs, personnel, central purchasing, approved supplier lists, franchise sales personnel (or independent franchise sales representatives), etc.

15.4 **Confidential Information.** You will take all appropriate actions to preserve the confidentiality of all Confidential Information. Access to Confidential Information should be limited to persons who need the Confidential Information to perform their jobs and are subject to your general policy on maintaining confidentiality as a condition of employment or who have first signed a confidentiality agreement. You will not permit copying of Confidential Information (including, as to computer software, any translation, decompiling, decoding, modification or other alteration of the source code of such software). You will use Confidential Information only for the Facility and to perform under this Agreement. Upon termination (or earlier, as we may request), you shall return to us all originals and copies of the System Standards Manual, policy statements and Confidential Information "fixed in any tangible medium of expression," within the meaning of the U.S. Copyright Act, as amended. Your obligations under this subsection commence when you sign this Agreement and continue for trade secrets (including computer software we license to you) as long as they remain secret and for other Confidential Information, for as long as we continue to use the information in confidence, even if edited or revised, plus three years. We will respond promptly and in good faith to your inquiry about continued protection of any Confidential Information.

15.5 **Litigation.** You will promptly notify us of (i) any adverse or infringing uses of the Marks (or names or symbols confusingly similar), Confidential Information or other System intellectual property, and (ii) or any threatened or pending litigation related to the System against (or naming as

18

DAYEXC1
186207.2 Q3/05

a party) you or us of which you become aware. We alone handle disputes with third parties concerning use of all or any part of the System. You will cooperate with our efforts to resolve these disputes. We need not initiate suit against imitators or infringers who do not have a material adverse impact on the Facility, or any other suit or proceeding to enforce or protect the System in a matter we do not believe to be material.

15.6 **The Internet.** You may use the Internet to market the Facility subject to this Agreement and System Standards. You shall not use, license or register any domain name, universal resource locator, or other means of identifying you or the Facility that uses a mark or any image or language confusingly similar to a Mark without our consent. You will assign to us any such identification at our request without compensation or consideration. You must make available through the Reservation System and the Chain website all rates you offer to the general public via Internet marketing arrangements with third parties. You must participate in the Chain's best available rate on the Internet guarantee or successor program. The content you provide us or use yourself for any Internet marketing must be true, correct and accurate, and you will notify us in writing promptly when any correction to the content becomes necessary. You shall promptly modify at our request the content of any Internet marketing material for the Facility you use, authorize, display or provide to conform to System Standards. Any use of the Marks and other elements of the System on the Internet inures to our benefit under Section 15.2.

16. **Relationship of Parties.**

16.1 **Independence.** You are an independent contractor. You are not our legal representative or agent, and you have no power to obligate us for any purpose whatsoever. We and you have a business relationship based entirely on and circumscribed by this Agreement. No partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this Agreement. You will exercise full and complete control over and have full responsibility for your contracts, daily operations, labor relations, employment practices and policies, including, but not limited to, the recruitment, selection, hiring, disciplining, firing, compensation, work rules and schedules of your employees.

16.2 **Joint Status.** If you comprise two or more persons or entities (notwithstanding any agreement, arrangement or understanding between or among such persons or entities) the rights, privileges and benefits of this Agreement may only be exercised and enjoyed jointly. The liabilities and responsibilities under this Agreement will be the joint and several obligations of all such persons or entities.

17. **Legal Matters.**

17.1 **Partial Invalidity.** If all or any part of a provision of this Agreement violates the law of your state (if it applies), such provision or part will not be given effect. If all or any part of a provision of this Agreement is declared invalid or unenforceable, for any reason, or is not given effect by reason of the prior sentence, the remainder of the Agreement shall not be affected. However, if in our judgment the invalidity or ineffectiveness of such provision or part substantially impairs the value of this Agreement to us, then we may at any time terminate this Agreement by written notice to you without penalty or compensation owed by either party.

19

**17.2  Waivers, Modifications and Approvals.**  If we allow you to deviate from this Agreement, we may insist on strict compliance at any time after written notice.  Our silence or inaction will not be or establish a waiver, consent, course of dealing, implied modification or estoppel.  All modifications, waivers, approvals and consents of or under this Agreement by us must be in writing and signed by our authorized representative to be effective. We may unilaterally revise Schedule C when this Agreement so permits.

**17.3  Notices.**  Notices will be effective if in writing and delivered (i) by facsimile transmission with confirmation original sent by first class mail, postage prepaid, (ii) by delivery service, with proof of delivery, or (iii) by first class, prepaid certified or registered mail, return receipt requested, to the appropriate party (x) at its address stated below or as it may otherwise designate by notice, or (y) by such other means as to result in actual or constructive receipt by the person or office holder designated below.  The parties may also communicate via electronic mail between addresses to be established by notice. You consent to receive electronic mail from us. Notices shall be deemed given on the date delivered or date of attempted delivery, if refused.

Days Inns Worldwide, Inc.:
Our address:  1 Sylvan Way, P.O. Box 278, Parsippany, New Jersey 07054-0278
Attention: Vice President-Franchise Administration; Fax No.  (973) 496-5359

Your name: KK SANKAR MAHADEV CORPORATION
Your address: 3022 N.W. Expressway, Oklahoma City, Oklahoma 73112
Attention: Champ & Sam Patel
Your fax No.:

**17.4  Remedies.**  Remedies specified in this Agreement are cumulative and do not exclude any remedies available at law or in equity.  The non-prevailing party will pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this Agreement or collect amounts owed under this Agreement.

**17.5  Miscellaneous.**  This Agreement is exclusively for the benefit of the parties.  There are no third party beneficiaries.  No agreement between us and anyone else is for your benefit.  The section headings in this Agreement are for convenience of reference only.

**17.6  Choice of Law; Venue; Dispute Resolution.**

17.6.1  This Agreement will be governed by and construed under the laws of the State of New Jersey, except for its conflicts of law principles.  The New Jersey Franchise Practices Act will not apply to any Facility located outside the State of New Jersey.

17.6.2  The parties shall attempt in good faith to resolve any dispute concerning this Agreement or the parties' relationship promptly through negotiation between authorized representatives.  If these efforts are not successful, either party may attempt to resolve the dispute through non-binding mediation.  Either party may request mediation through the National Franchise Mediation Program, using the procedures employed by the CPR Institute for Dispute Resolution,

DAYEXCI
186207.2 Q3/05

Inc. We will provide you with the contact address for that organization. The mediation will be conducted by a mutually acceptable and neutral third party. If the parties cannot resolve the dispute through negotiation or mediation, or choose not to negotiate or mediate, either party may pursue litigation.

17.6.3 You consent and waive your objection to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey for all cases and controversies under this Agreement or between we and you.

**17.6.4  WAIVER OF JURY TRIAL.  THE PARTIES WAIVE THE RIGHT TO A JURY TRIAL IN ANY ACTION RELATED TO THIS AGREEMENT OR THE RELATIONSHIP BETWEEN THE LICENSOR, THE LICENSEE, ANY GUARANTOR, AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS.**

**17.7  Special Acknowledgments.  You acknowledge the following statements to be true and correct as of the date you sign this Agreement, and to be binding on you.**

**17.7.1  You received our UFOC for prospective licensees at least 10 business days before, and a copy of this Agreement and all other agreements we are asking you to sign at least 5 business days before, signing this Agreement and paying the Initial Fee to us.  You have received our UFOC at least 10 business days before you paid any fee to us or signed any contract with us.**

**17.7.2  Neither we nor any person acting on our behalf has made any oral or written representation or promise to you on which you are relying to enter into this Agreement that is not written in this Agreement.  You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement.**

**17.7.3  This Agreement, together with the exhibits and schedules attached, is the entire agreement superseding all previous oral and written representations, agreements and understandings of the parties about the Facility and the License.**

**17.7.4  You acknowledge that no salesperson has made any promise or provided any information to you about projected sales, revenues, income, profits or expenses from the Facility except as stated in Item 19 of the UFOC or in a writing that is attached to this Agreement.**

**17.7.5  You understand that the franchise relationship is an arms' length, commercial business relationship in which each party acts in its own interest.**

17.8  <u>Protected Territory</u>.  We will not own, operate, lease, manage, or license any party but you to operate a Chain Facility in the "Protected Territory", defined below, while this Agreement is in effect.  We may own, operate, lease, manage, franchise or license anyone to operate any Chain Facility located anywhere outside the Protected Territory without any restriction or obligation to you.  We may grant Protected Territories for other Chain Facilities that overlap your Protected

21

DAYEXCI
186207.2 Q3/05

DEC-22-2005  03:48                                                      NO.000   P.02/02

effect. We may own, operate, lease, manage, franchise or license anyone to operate any Chain Facility located anywhere outside the Protected Territory without any restriction or obligation to you. We may grant Protected Territories for other Chain Facilities that overlap your Protected Territory. While this Agreement is in effect, neither you nor your officers, directors, general partners or owners of 25% or more of your Equity Interests, may own, operate, lease, manage or franchise any guest lodging facility other than the Facility in the Protected Territory unless we or our affiliate licenses the facility. You will use any information obtained through the Reservation System to refer guests, directly or indirectly, only to Chain Facilities. This Section does not apply to any Chain Facility located in the Protected Territory on the Effective Date, which we may renew, relicense, allow to expand, or replace with a replacement Facility located within the same trading area having not more than 120% of the guest rooms of the replaced Chain Facility if its license with us terminates or is not renewed. The Protected Territory fairly represents the Facility's trading area, and you acknowledge that. There are no express or implied territorial rights or agreements between the parties except as stated in this Section. By electing to include this section in your Agreement, you irrevocably waive any right to seek or obtain the benefits of any policy we now follow or may in the future follow to notify you about proposed Chain Facilities in the general area of the Facility, solicit information about the effect of the proposed Chain Facility on the revenue or occupancy of the Facility or decide whether to add the proposed Chain Facility to the Chain based on the potential effect of the proposed Chain Facility on the Facility or its performance. The covenants in this Section are mutually dependent; if you breach this Section, your Protected Territory will be the Location only. The Protected Territory means **all the area with the circle having a three (3) mile radius whose centerpoint is the front door of the Facility.**

**18. Special Stipulations.** The following special stipulations apply to this Agreement and supersede any inconsistent or conflicting provisions. You acknowledge that these stipulations and any changes made to the body of the Agreement at your request or in response to other changes to our form agreement are the product of arms' length negotiations with us and represent mutually agreed, material inducements to enter into this Agreement, beneficial to you and supported by adequate consideration from both parties. These are personal to you and are not transferable or assignable except to a Permitted Transferee.

**18.1  Special Combined Fees.** Notwithstanding Section 7.1, you will pay the "Combined Fee," consisting of the Royalty and the Basic Service Charge (excluding all Additional Charges such as commissions and related service charges, Internet fees, the Special Marketing Assessment, service fees and charges, guest reward and affinity program fees, guest complaint assessments, GDS Fees and similar fees and charges described in Schedule C), to us at the rates set forth in this Section, **provided that the Facility opens by the deadline specified in Section 3.1 of this Agreement:**

18.1.1 The Combined Fee shall be six and eight tenths percent (6.8%) of Gross Room Revenues accruing during the first, second and third License Years; and

18.1.2 The Combined Fee shall be seven and eight tenths percent (7.8%) of Gross Room Revenues accruing during the fourth License Year; and

18.1.3. The Royalty and Basic Service Charge shall be computed and paid at the rates specified in Section 7.1 on Gross Room Revenues accruing after the fourth License Year.

TOTAL P.02

18.4.3   The rate changes set forth in this Section automatically terminate without notice or opportunity to cure, and the Combined Fee shall reset to the rates specified in Section 7, if and as of the date (i) a Termination occurs, or we send you a notice of default and you fail to cure the default within the time specified, if any, in the notice of default, or (ii) after you satisfy the Improvement Obligation, the Facility receives a quality assurance inspection score of more than 200 (or its then equivalent) and the Facility fails to achieve a quality assurance inspection score of less than 200 in a reinspection to be performed not less than 60 days after the initial inspection.

**18.5  Your Additional Termination Right.**  You may terminate the License without cause or penalty effective only on the fifth or tenth anniversary of the Opening Date provided you give us at least six (6) months prior written notice of termination and you are not in default under this Agreement at the time notice must be given or at the effective date of termination.  You will pay no Liquidated Damages if you satisfy the conditions of the preceding sentence and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination.  Your rights under this Section will automatically terminate without notice if and as of the date (i) a Termination occurs, (ii) you fail to cure any default under this Agreement within the time permitted, if any, in the notice of default we send you, or (iii) after the Facility satisfies the Improvement Obligation, the Facility scores more than 200 points (or its then equivalent) on a quality assurance inspection and then fails to achieve a score less than 200 points (or its then equivalent) in a reinspection to be performed no sooner than 90 days after the initial inspection. You will not exercise this right if the Facility is then financed under a program in which the United States Small Business Administration ("SBA") guarantees the financing or its repayment unless you first obtain SBA's consent.

**18.6  Our Additional Termination Right.**  We may terminate the License without cause or penalty effective only on the fifth or tenth anniversary of the Opening Date provided we give you at least six (6) months prior written notice of termination.  You will perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination.  You will pay no Liquidated Damages if we terminate the License under this Section and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination.  We will not exercise this right if you notify us that the Facility is then financed under a program in which the United States Small Business Administration ("SBA") guarantees the financing or its repayment unless we first obtain SBA's consent.

**18.7  Liquidated Damages.**  Liquidated Damages payable under Section 12.1 for a Termination that occurs before the last two License Years will be One Thousand Dollars ($1,000.00) for each guest room of the Facility you are authorized to operate at the time of Termination.

**18.8  Reduced Relicense Fee.**  If (i) you are not then in default under this Agreement, (ii) we receive your proposed transferee's Franchise Application and Application Fee before you Transfer the Facility, and (iii) we receive the Franchise Application before the end of the first License Year, then the Relicense Fee for a Transfer will be $5,000.  If the conditions are not satisfied, and after the first License Year, the Relicense Fee will be as specified in Section 7.4.

23

DAYEXCI
186207.2 Q3/05

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first stated above.

WE:
**DAYS INNS WORLDWIDE, INC.:**

By: _____        Attest: _____
       Vice President                                  Assistant Secretary


YOU, as licensee:
**KK SANKAR MAHADEV CORPORATION**

By: _S. HARIESH KUMAR_              Attest: _____
       (Vice) President

24

DAYEXCI
186207.2 Q3/05

# APPENDIX A

## DEFINITIONS

Agreement means this License Agreement.

Application Fee means the fee you pay when you submit your Application under Section 6.

Approved Plans means your plans and specifications for constructing or improving the Facility initially or after opening, as approved by us under Section 3.

Casualty means destruction or significant damage to the Facility by act of God or other event beyond your reasonable anticipation and control.

Chain means the network of Chain Facilities.

Chain Facility means a lodging facility we own, lease, manage, operate or authorize another party to operate using the System and identified by the Marks.

Condemnation means the taking of the Facility for public use by a government or public agency legally authorized to do so, permanently or temporarily, or the taking of such a substantial portion of the Facility that continued operation in accordance with the System Standards, or with adequate parking facilities, is commercially impractical, or if the Facility or a substantial portion is sold to the condemning authority in lieu of condemnation.

Conference Fee means the fee we charge for your attendance at a conference for Chain Facilities and their licensees when and if held.

Confidential Information means any trade secrets we own or protect and other proprietary information not generally known to the lodging industry including confidential portions of the System Standards Manual or information we otherwise impart to you and your representatives in confidence. Confidential Information includes the "Rules of Operation Manual" and all other System Standards manuals and documentation, including those on the subjects of employee relations, finance and administration, field operation, purchasing and marketing, the Reservation System software and applications software.

Design Standards mean standards specified in the System Standards Manual from time to time for design, construction, renovation, modification and improvement of new or existing Chain Facilities, including all aspects of facility design, number of rooms, rooms mix and configuration, construction materials, workmanship, finishes, electrical, mechanical, structural, plumbing, HVAC, utilities, access, life safety, parking, systems, landscaping, amenities, interior design and decor and the like for a Chain Facility.

25

Directory means the general purpose directory we publish listing the names and addresses of Chain Facilities, and at our discretion, other Days Inn facilities located outside the United States, Canada and Mexico.

Effective Date means the date we insert in the Preamble of this Agreement after we sign it.

Equity Interests shall include, without limitation, all forms of equity ownership of you, including voting stock interests, partnership interests, limited liability company membership or ownership interests, joint and tenancy interests, the proprietorship interest, trust beneficiary interests and all options, warrants, and instruments convertible into such other equity interests.

Equity Transfer means any transaction in which your owners or you sell, assign, transfer, convey, pledge, or suffer or permit the transfer or assignment of, any percentage of your Equity Interests that will result in a change in control of you to persons other than those disclosed on Schedule B, as in effect prior to the transaction. Unless there are contractual modifications to your owners' rights, an Equity Transfer of a corporation or limited liability company occurs when either majority voting rights or beneficial ownership of more than 50% of the Equity Interests changes. An Equity Transfer of a partnership occurs when a newly admitted partner will be the managing, sole or controlling general partner, directly or indirectly through a change in control of the Equity Interests of an entity general partner. An Equity Transfer of a trust occurs when either a new trustee with sole investment power is substituted for an existing trustee, or a majority of the beneficiaries convey their beneficial interests to persons other than the beneficiaries existing on the Effective Date. An Equity Transfer does not occur when the Equity Interest ownership among the owners of Equity Interests on the Effective Date changes without the admission of new Equity Interest owners. An Equity Transfer occurs when you merge, consolidate or issue additional Equity Interests in a transaction which would have the effect of diluting the voting rights or beneficial ownership of your owners' combined Equity Interests in the surviving entity to less than a majority.

Facility means the Location, together with all improvements, buildings, common areas, structures, appurtenances, facilities, entry/exit rights, parking, amenities, FF&E and related rights, privileges and properties existing at the Location on the Effective Date or afterwards.

FF&E means furniture, fixtures and equipment.

FF&E Standards means standards specified in the System Standards Manual for FF&E and supplies to be utilized in a Chain Facility.

Food and Beverage means any restaurant, catering, bar/lounge, entertainment, room service, retail food or beverage operation, continental breakfast, food or beverage concessions and similar services offered at the Facility.

Gross Room Revenues means gross revenues attributable to or payable for rentals of guest rooms at the Facility, including all credit transactions, whether or not collected, but excluding separate charges to guests for Food and Beverage, room service, telephone charges, key forfeitures and entertainment; vending machine receipts; and federal, state and local sales, occupancy and use taxes.

26

DAYEXCI
186207.2 Q3/05

Improvement Obligation means your obligation to either (i) renovate and upgrade the Facility, or (ii) construct and complete the Facility, in accordance with the Approved Plans and System Standards, as described in Section 3.

Indemnitees means us, our direct and indirect parent, subsidiary and sister corporations, and the respective officers, directors, shareholders, employees, agents and contractors, and the successors, assigns, personal representatives, heirs and legatees of all such persons or entities.

Initial Entry Charge means the fee you are to pay for gaining access to the Reservation System when you sign this Agreement and on the first and second anniversaries of the Effective Date under Section 6.2.

Initial Fee means the fee you are to pay for signing this Agreement as stated in Section 6.1.

License means the non-exclusive license to operate the type of Chain Facility described in Schedule B only at the Location, using the System and the Mark we designate in Section 1.

License Year means:

(i) *If the Opening Date occurs on the first day of a month*: the period beginning on the Opening Date and ending on the day immediately preceding the first anniversary of the Opening Date, and each subsequent one year period; or

(ii) *If the Opening Date does not occur on the first day of a month:* the period beginning on the Opening Date and ending on the first anniversary of the last day of the month in which the Opening Date occurs, and each subsequent one year period.

Liquidated Damages means the amounts payable under Section 12, set by the parties because actual damages will be difficult or impossible to ascertain on the Effective Date and the amount is a reasonable pre-estimate of the damages that will be incurred and is not a penalty.

Location means the parcel of land situated at **7100 NE Pravin Road, Kansas City, MO 64117**, as more fully described in Schedule A.

Losses and Expenses means (x) all payments or obligations to make payments either (i) to or for third party claimants by any and all Indemnitees, including guest refunds, or (ii) incurred by any and all Indemnitees to investigate, respond to or defend a matter, including without limitation investigation and trial charges, costs and expenses, attorneys' fees, experts' fees, court costs, settlement amounts, judgments and costs of collection; and (y) the "Returned Check Fee" we then specify in the System Standards Manual ($20.00 on the Effective Date) if the drawee dishonors any check that you submit to us.

Maintenance Standards means the standards specified from time to time in the System Standards Manual for repair, refurbishment and replacement of FF&E, finishes, decor, and other capital items and design materials in Chain Facilities.

27

Marks means, collectively (i) the service marks associated with the System published in the System Standards Manual from time to time including, but not limited to, the name, design and logo for "Days Inn" and other marks (U.S. Reg. Nos.: 1,160,430; 1,160,431; 1,420,612; 1,469,518; and 1,003,834) and (ii) trademarks, trade names, trade dress, logos and derivations, and associated good will and related intellectual property interests.

Marks Standards means standards specified in the System Standards Manual for interior and exterior Mark-bearing signage, advertising materials, china, linens, utensils, glassware, uniforms, stationery, supplies, and other items, and the use of such items at the Facility or elsewhere.

Minor Renovation means the repairs, refurbishing, repainting, and other redecorating of the interior, exterior, guest rooms, public areas and grounds of the Facility and replacements of FF&E we may require you to perform under Section 3.16.

Minor Renovation Ceiling Amount means $3,000.00 per guest room.

Minor Renovation Notice means the written notice from us to you specifying the Minor Renovation to be performed and the dates for commencement and completion given under Section 3.16.

Opening Date means the date on which we authorize you to open the Facility for business identified by the Marks and using the System.

Operations Standards means standards specified in the System Standards Manual for cleanliness, housekeeping, general maintenance, repairs, concession types, food and beverage service, vending machines, uniforms, staffing, employee training, guest services, guest comfort and other aspects of lodging operations.

Permitted Transferee means (i) any entity, natural person(s) or trust receiving from the personal representative of an owner any or all of the owner's Equity Interests upon the death of the owner, if no consideration is paid by the transferee or (ii) the spouse or adult issue of the transferor, if the Equity Interest transfer is accomplished without consideration or payment, or (iii) any natural person or trust receiving an Equity Interest if the transfer is from a guardian or conservator appointed for an incapacitated or incompetent transferor.

Punch List means the list of upgrades and improvements attached as part of Schedule B, which you are required to complete under Section 3.

Recurring Fees means fees paid to us on a periodic basis, including without limitation, Royalties, System Assessment Fees, Basic Service Charges, and other reservation fees and charges as stated in Section 7.

Relicense Fee means the fee your transferee or you pay to us under Section 7 when a Transfer occurs.

28

DAYEXC1
186207.2 Q3/05

<u>System Assessment Fees</u> means the fees you pay to us under Section 7 and Schedule C for reservation services, including the Basic Service Charge and any other fees we charge for services provided by or through the Reservation System.

<u>Reservation System</u> or "Central Reservation System" means the system for offering to interested parties, booking and communicating guest room reservations for Chain Facilities described in Section 4.2.

<u>Rooms Addition Fee</u> means the fee we charge you for adding guest rooms to the Facility.

<u>Royalty</u> means the monthly fee you pay to us for use of the System under Section 7(a). "Royalties" means the aggregate of all amounts owed as a Royalty.

<u>Service Interruption Fee</u> means the fee you pay us when we suspend Central Reservation System service because you default under this Agreement, in the amount specified in Schedule C.

<u>System</u> means the comprehensive system for providing guest lodging facility services under the Marks as we specify which at present includes only the following:  (a) the Marks; (b) other intellectual property, including Confidential Information, System Standards Manual and know-how; (c) marketing, advertising, publicity and other promotional materials and programs; (d) System Standards; (e) training programs and materials; (f) quality assurance inspection and scoring programs; and (g) the Reservation System.

<u>System Standards</u> means the standards for the participating in the System published in the System Standards Manual, including but not limited to Design Standards, FF&E Standards, Marks Standards, Operations Standards, Technology Standards and Maintenance Standards and any other standards, policies, rules and procedures we promulgate about System operation and usage.

<u>System Standards Manual</u> means the Operating Policies Manual, the Planning and Design Standards Manual and any other manual we publish or distribute specifying the System Standards.

<u>Taxes</u> means the amounts payable under Section 7.2 of this Agreement.

<u>Technology Standards</u> means standards specified in the System Standards Manual for local and long distance telephone communications services, telephone, telecopy and other communications systems, point of sale terminals and computer hardware and software for various applications, including, but not limited to, front desk, rooms management, records maintenance, marketing data, accounting, budgeting and interfaces with the Reservation System to be maintained at the Chain Facilities.

<u>Term</u> means the period of time during which this Agreement shall be in effect, as stated in Section 5.

<u>Termination</u> means a termination of the License under Sections 11.1 or 11.2 or your termination of the License or this Agreement.

29

DAYEXCI
186207.2 Q3/05

<u>Transfer</u> means (1) an Equity Transfer, (2) you assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise without our consent as specified in Section 9, (3) you assign (other than as collateral security for financing the Facility) your leasehold interest in (if any), lease or sublease all or any part of the Facility to any third party, (4) you engage in the sale, conveyance, transfer, or donation of your right, title and interest in and to the Facility, (5) your lender or secured party forecloses on or takes possession of your interest in the Facility, directly or indirectly, or (6) a receiver or trustee is appointed for the Facility or your assets, including the Facility. A Transfer does not occur when you pledge or encumber the Facility to finance its acquisition or improvement, you refinance it, or you engage in a Permitted Transferee transaction.

"You" and "Your" means and refers to the party named as licensee identified in the first paragraph of this Agreement and its Permitted Transferees.

"We", "Our" and "Us" means and refers to Days Inns Worldwide, Inc., a Delaware corporation, its successors and assigns.

30

DAYEXCI
186207.2  Q3/05

CENDANT HOTEL GROUP, INC.
8475184062

R59255

STATE OF MO.
CLAY COUNTY
I CERTIFY INSTR. REC'D

JAN 03 2003

03 JAN -3 A 9: 13 ª
BOOK 3926 PAGE 796
ROBERT Y. SEVIER
RECORDER OF DEEDS
By Mindy
Mishake Deputy

BK 3926 PG 796

# MISSOURI WARRANTY DEED

**THIS INDENTURE**, Made on *December 17, 2002* by and between

Grantor:  **SUNNY ENTERPRISES, L.L.C., A MISSOURI LIMITED LIABILITY COMPANY**

AND

Grantee:  **K.K. SHANKAR MAHADEV CORP., A MISSOURI CORPORATION**
whose mailing address is  *7100 N.E. Parvin Road, Kansas City, MO 64153*

**WITNESSETH**: THAT THE SAID GRANTOR, in consideration of the sum of ONE DOLLAR AND OTHER VALUABLE CONSIDERATIONS to be paid by said grantee(s) (the receipt of which is hereby acknowledged), do by these presents, Grant, Bargain and Sell, Convey and Confirm unto the said grantee(s) his/her/their heirs and assigns, the following described lots, tracts or parcels of land lying, being and situate in the County of **Clay** and State of **Missouri**, to-wit:

Legal Description:
All that part of Lot 3, GREAT MIDWEST COMMERCE CENTER DISTRICT 1, a subdivision in Kansas City, Clay County, Missouri, being more particularly described as follows:  Beginning at the Southwest corner of said Lot 3; thence South 66 degrees 03 minutes 34 seconds East, 40.00 feet to the true point of beginning; thence North 23 degrees 56 minutes 26 seconds East and parallel to the Westerly line of said Lot 3, 356.67 feet to a point on the Northerly line of said Lot 3; thence South 75 degrees 31 minutes 18 seconds East along said line, 257.66 feet to a point on the Easterly line of said Lot 3; thence South 22 degrees 58 minutes 45 seconds West along said line, 348.24 feet to a point of curve, said curve having a radius of 50.00 feet; thence along said curve to the right, 79.38 feet to a point of tangency, said point being on the Southerly line of said Lot 3; thence North 66 degrees 03 minutes 34 seconds West, 210 feet to the true point of beginning, shown as Tract II on Lot Split Survey, Lots 2 and 3, GREAT MIDWEST COMMERCE CENTER DISTRICT 1, filed November 1, 1984, under Document No. E-92462 in Book 1579 at Page 993.

Realty Title Company - **C0212113** (1)                                                            Page 1

②
26

**SCHEDULE B**

PART I:        YOUR OWNERS:

| Name | Ownership Percentage | Type of Equity Interest | Office Held (Title) |
|---|---|---|---|
| Shailesh Kumar | 40% | common stock | |
| Keith Parker | 40% | common stock | |
| Bhavika Patel | 20% | common stock | |

PART II:        THE FACILITY:

Primary designation of Facility:  Days Inn

Number of approved guest rooms:  86.

Parking facilities (number of spaces, description):  At least 86.

Other amenities, services and facilities:

PART III:        DESCRIPTION AND SCHEDULE OF RENOVATIONS TO BE
COMPLETED AS THE IMPROVEMENT OBLIGATION:

**[Punch List to be attached.]**

**Initial** _____

DAYEXCI
186207.2 Q3/05

32

MO KANSAS CITY BEST WESTERN CV

Tier: Inn

Days Inns Worldwide, Inc.
Punchlist for Conversion
"Schedule B Part III"
12/20/2005
**Revised on January 4, 2006**

Page. 1 of: 6

DAYS INN

| OWNER APPLICANT | |
|---|---|
| Property Name: | Best Western |
| Property Address: | 7100 NE Parvin Road |
| City: | Kansas City St MO Zip 64117 |
| Conversion Consultant: | Kevin Stephens |
| Owner/Applicant: | Champ Patel |
| Phone: | 816-453-3355 |
| Salesperson: | Amgad Basily |
| Phone: | 314-973-7748 |

| ROOM DIMENSIONS - EXISTING | | | | |
|---|---|---|---|---|
| # of Rms 86 | 11.75 (width) x | 25.00 (length) = | 293.75 sq. ft. | |
| # of Rms ___ | ___ (width) x | ___ (length) = | ___ sq. ft. | |
| # of Rms ___ | ___ (width) x | ___ (length) = | ___ sq. ft. | |
| # of Rms ___ | ___ (width) x | ___ (length) = | ___ sq. ft. | |
| # of Rms ___ | ___ (width) x | ___ (length) = | ___ sq. ft. | |
| # of Rms ___ | ___ (width) x | ___ (length) = | ___ sq. ft. | |
| ROOM DIMENSION STANDARD: 288 SF | | | | |

| GUESTROOMS | |
|---|---|
| TOTAL ROOMS: | 86 |
| Rentable | 82 |
| Water Damage | 4 |

**PROPERTY CONDITION SUMMARY**

This 17-year-old property is located in a "Level A" market. Property consists of one L-shaped building that is two stories, single loaded and exterior corridor. Construction is wood frame with a pitched composition roof. The facade is brick/wood shake with wood trim. Upgrades to the building exteriors, public areas and guestroom will be required to meet System Standards. Landscaping will require minor upgrades. The lobby is undersized. Breakfast area dimensions: 13' x 26' + 8' x 10' = 418 SF. Currently, four rooms are off market due to water damage from a burst pipe.

Located off Interstate 435 (Parvin Road Exit), this property caters to a mostly leisure clientele (75%) with some business travelers (25%). Competition includes Super 8 Motel, Comfort Inn, Fairfield Inn, Holiday Inn and Crossland.

| PUBLIC AREA DIMENSIONS - EXISTING | | | | STANDARD |
|---|---|---|---|---|
| Lobby | 15.25 (width) x | 15.75 (length) = | 240.19 sq. ft. | 800 SF |
| Breakfast Area | ___ (width) x | ___ (length) = | 418.00 sq. ft. | N/A |
| | ___ (width) x | ___ (length) = | ___ sq. ft. | |

| PUBLIC AREA DIMENSIONS - EXISTING | | | STANDARD |
|---|---|---|---|
| ___ (width) x | ___ (length) = | ___ sq. ft. | |
| ___ (width) x | ___ (length) = | ___ sq. ft. | |
| ___ (width) x | ___ (length) = | ___ sq. ft. | |

**COMPLETION TIME**

All items in this punchlist are required to be completed no later than 90 days of opening, unless otherwise noted. Time extensions in no way imply a waiver. *All items will continue to be evaluated on condition, appearance and adherence to System Standards.*

**ONLY THE FRANCHISOR MAY REVISE THIS PUNCHLIST. PUNCHLIST VOID 180 DAYS AFTER INSPECTION DATE UNLESS FRANCHISE OR LICENSE AGREEMENT BECOMES EFFECTIVE.**

This Punchlist identifies actions needed to cause the Facility to meet the Franchisor's standards. You are solely responsible for compliance of the Facility with applicable federal, state and local laws, codes, ordinances and regulations. You have been provided a Punchlist Reference Guide to assist in compliance with punchlist completion and Brand Standards.

This Punchlist was based on a random sample inspection of the Facility on the date specified. You may need to take additional actions to meet our Standards, or comply with law, or at our discretion if we modify our Standards or the condition of the Facility changes materially after the inspection date.

Revisions-All Previous Copies are Invalid

| | |
|---|---|
| 12/28/05 | TG |
| 01/04/06 | ams |

**The Franchise Review Committee may in its discretion revise this Punchlist as a condition of approving your application. You should not consider this Punchlist to be final until we sign the License or Franchise Agreement.**

Signed: [signature] Date: 1-4-06

Print Name: SHAILESH KUMAR

Quality Assurance

Initials: ____

Case 2:17-cv-00589-MCA-LDW Document 1 Filed 01/30/17 Page 45 of 69 PageID: 45

MO KANSAS CITY BEST WESTERN CV

| Items Variance | For Office Use Only |
|---|---|
| The existing lobby size is acceptable due to a separate breakfast room is provided. | |
| The existing light textured lobby/public restroom wall finish will be acceptable until condition reaches "Moderate" on any future Quality Assurance evaluation. | |
| The existing wood/metal breakfast chairs are acceptable until condition grades a "Moderate" on any future Quality Assurance evaluation. | |
| The existing decorative ceiling mounted guestroom light fixtures will be acceptable in addition to the required lamp package. | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

Quality Assurance.

MO KANSAS CITY BEST WESTERN CV

| COMPLETION DATE | EXTERIOR→ SCOPE OF WORK | For Office Use Only |
|---|---|---|
| 90 days after opening | Provide Company approved signage. | |
| 90 days after opening | Replace damaged marquee face | |
| 90 days after opening | Replace wood "Office" sign with a sign that meets current graphics standards. Contact the Brand Identity Department at (973) 496-5224 for assistance. | |
| 90 days after opening | Replace worn United States and Missouri flags and eliminate the Best Western flag. | |
| 10/1/06 | Construct staircase towers and incorporate a design that compliments the current exterior design. Contact the Design and Development Department at (973) 496-2522 for assistance. | |
| 5/1/06 | Paint building (lattice work, columns, railings and stairways) to eliminate worn finishes. Approved color schemes are recommended. | |
| 5/1/06 | Clean/paint doors to eliminate scuff marks. Recommend installation of kick plates to prevent future scuff marks. | |
| 90 days after opening | Provide breaker bars for fire extinguisher cabinets | |
| 90 days after opening | Replace wood directional/service signage package. | |
| 5/1/06 | Prior to season opening, ensure pool safety and security items, pool furniture, condition of deck, etc. meet all System Standards. | |
| Prior to opening | Eliminate unrestricted access to pool deck from the former guest laundry/maintenance room sliding glass doors by installing matching metal fencing.  Paint existing pool fence. | |
| Prior to opening | Provide a safety equipment and signage package to meet System Standards and display year round. | |
| 5/1/06 | Provide swimming pool furniture per System Standards. | |
| 5/1/06 | Provide planters with colorful seasonal flowers in the pool area as in landscaping sample ST-1.1. | |

Quality Assurance

MO KANSAS CITY BEST WESTERN CV

Page 4 of 6

JAN 05 2006 15:58    PAGE.04

## EXTERIOR

| COMPLETION DATE | SCOPE OF WORK | For Office Use Only |
|---|---|---|
| 90 days after opening | Pressure wash parking lot to eliminate oil stains/buildup. | |
| 90 days after opening | Restripe parking lot and paint curbs. | |
| 90 days after opening | Replace damaged boards/paint the Dumpster enclosure. | |
| | Upon completion of renovation, remove (temporary) storage unit from property. | |
| | | |

Initials _____ PBCKCI

Quality Assurance

MO KANSAS CITY BEST WESTERN CV

Page: 5  of: 6

| COMPLETION DATE | PUBLIC AREAS — SCOPE OF WORK | For Office Use Only |
|---|---|---|
| Prior to opening | Facilities to assist the handicapped in accordance with local, state and federal codes, regulations and ordinances are required. | |
| 90 days after opening | Provide a property management system per System Standards. | |
| 90 days after opening | All owners/general managers are required to attend all Brand orientation/training. | |
| 90 days after opening | Property manager is required to be TripRewards certified and property must comply with all TripRewards requirements. | |
| 90 days after opening | Provide complimentary USA Today® newspapers and wireless, high-speed Internet access in the lobby and breakfast areas. | |
| Prior to opening | Provide a Daybreak® breakfast per System Standards. | |
| 90 days after opening | Provide flammable storage per System Standards. | |
| 90 days after opening | Deep clean, regrout and seal ceramic tile flooring in the lobby foyer. Recaulk as needed. | |
| 90 days after opening | Replace/eliminate wood "Registration" sign. | |
| 90 days after opening | Refinish breakfast area wood table edges/wood chair backs/seals to eliminate worn finishes. | |
| 90 days after opening | Conceal all loose wires from ceiling in breakfast area. | |
| Prior to opening | Currently, property has unplugged one of two ice machines due to low occupancy. This is not acceptable. Ice machines must remain in service at all times for guests' convenience. | |
| 90 days after opening | Deep clean vending areas. | |
| 90 days after opening | Install a shower curtain in public restroom to conceal bathtub from guests' view. | |

Quality Assurance

MO KANSAS CITY BEST WESTERN CV

Page 6 of 6

**GUESTROOMS**

ROOMS INSPECTED: 107, 112, 130, 142, 209, 213, 226, 237

| COMPLETION DATE | SCOPE OF WORK | For Office Use Only |
|---|---|---|
| Prior to opening | Facilities to assist the handicapped in accordance with local, state and federal codes, regulations and ordinances are required. | |
| 90 days after opening | Replace wood room number plaques with a new Days Inn logo'd or generic plaque type. | |
| 90 days after opening | Replace/install weather stripping to eliminate gaps around entrance doors. | |
| 90 days after opening | Replace/provide guestroom/bath area wallcovering where mismatched/missing as in room #209. Flat finished walls are not acceptable. All walls should present a uniform appearance/finish. | |
| 90 days after opening | Replace carpet where burned as in rooms #142 and #226. | |
| 90 days after opening | Replace casegoods where worn/mismatched (i.e. older package pieces) as in room #226 and provide matching pieces (i.e. framed wall mirrors) where missing as in the single-bedded rooms. If matching pieces cannot be found, complete package replacement will be required. | |
| 90 days after opening | Provide matching floor lamps in leisure areas of guestrooms. If matching lamps cannot be found, complete package replacement will be required. | |
| 90 days after opening | Remove plastic cover form lampshades as in room #213. | |
| 90 days after opening | Replace bedsets (mattresses and boxsprings) to eliminate all that are stained, sagging or have loss of support as in rooms #142 and #226. | |
| 90 days after opening | Currently, four rooms are off-market due to water damage from a burst pipe. Ensure all damage in these rooms is repaired and restored to a "like new" condition. All E.F & E in these guestrooms is required to meet System Standards. | |
| 90 days after opening | Provide high-speed internet access, hairdryers, AM/FM alarm clock radios and required supplies in all guestrooms. A minimum of 50% of guestrooms must be designated as non-smoking. All major network channels are required. | |
| 90 days after opening | Install the required Days Inn upgraded bath amenity package to include curved shower rods, 6-function showerheads and Sol Terre™ Hoekless® shower curtains. | |
| | | |
| | | |

Quality Assurance

Initials

**DAYS INNS WORLDWIDE, INC.**
**SCHEDULE C**
September 2005

A.   System Assessment Fees

The System Assessment Fee includes the Basic Service Charge equal to 3.8% of Gross Room Revenues. We reserve the right to increase or modify the Basic Service Charge and any Additional Charges for all Chain Facilities in the United States and to add other fees and charges for new services, at our sole discretion as to amount or formula from time to time but with at least 30 days prior written notice and after consultation with the Board of Directors of the Days Inns Franchisee Advisory Association, and to add, drop or modify the types of services offered.

B.   Mandatory Marketing Program Charge

We charge a Mandatory Marketing Program Charge for your participation in the TripRewards® or successor guest loyalty program. Under TripRewards, program members staying at qualifying rates at Chain Facilities earn their choice of TripRewards points, airline miles or other program currency. TripRewards points are redeemable for free stays at Chain Facilities and for travel, merchandise, entertainment and other awards. The Mandatory Marketing Program Charge is up to 5% of the Gross Room Revenues accruing from each qualifying stay at the Facility. We will proactively match and award members with points or other program currency they earn on qualified stays even if they do not present their TripRewards membership card upon check–in. You will be billed monthly in arrears for qualifying stays by program members during the preceding month.

C.   GDS and Internet Booking Fees

We will charge you under our Central Commission Payment Program either a GDS Fee or an Internet Booking Fee for reservations processed through the global distribution systems ("GDS"), including any operated by an affiliate, or the Internet for your Facility. The GDS Fee described in Section 7 is $4.50 per reservation processed through any GDS or through any Internet website powered by a GDS. Internet-originated reservations carry fees of $3.50 per reservation booked through sources other than GDS powered websites or our Chain website. GDS and Internet-originated reservations may also carry a commission if the originator qualifies. If a guest cancels a GDS or Internet-originated reservation using the same source as was used to originate the reservation, you will not be charged the applicable fee.

D.   Additional System Assessment or Reservation System Charges

Agency and other commissions are typically 10% of the Gross Room Revenues generated by each reservation booked by an agency or other qualifying originator. Agencies which are part of a travel consortium or a travel management company, including our affiliates, may charge additional commissions of up to 5% and/or participation fees to be included in their programs. We may raise the agency commission to up to 15% of Gross Room Revenues from time to time for certain Chain-wide promotions upon 20 days advance written notice. Such

33

DAYEXC1
186207.2 Q3/05

increases will apply only to reservations booked after we announce the increased commission unless we specify otherwise. The general sales agent commission (also known as the international sales office commission) is 15% of the Gross Room Revenues generated by each reservation originated in an area served by a general sales agent/international sales office and includes the agency commission.

We may assess you for additional fees or commissions charged us by distribution channels, travel intermediaries and retailers or for performing other services. By accepting reservations from the GDS, Internet, travel agencies and other intermediaries, you agree to participate in our Central Commission Payment Program and to reimburse us for any fees or commissions we pay to them on your behalf.

If we suspend Central Reservation System service because of your default under this Agreement, then you must pay us a Service Interruption Fee of $200 before we restore service.

You must (i) make available through the Central Reservation System and the Chain website room rates equivalent to those offered to the general public by third parties that you authorize to offer and sell reservations for the Facility's guest rooms and (ii) participate in the Chain's Best Available Rate Guarantee Program according to its published requirements. Beginning May 1, 2004 if a guest finds a lower publicly available rate on the Internet than the "Best Available Rate" you offer through the Chain website or the Central Reservation System for the same date and accommodations and the guest meets all Program requirements, you must provide the first room night to the guest without a room charge. You may collect standard incidental fees, charges and taxes. We will also charge you a Processing Fee of $25 to reimburse us for our administrative charges of handling the complaint.

We will offer you the opportunity to participate in certain Internet distribution channel marketing and reservation activity with third parties including our affiliates. Under one type of arrangement, you will offer rooms for sale through an electronic distribution channel on which you will be paid a net, non-commissionable rate if and when the rooms are sold by the distribution channel at its marked-up rate. For providing and managing this activity we may receive commissions from the Internet distribution channels based upon the mark-up or room rates that they receive for renting your rooms. The net rate you receive, not the mark-up retained by the channel, should be included in Gross Room Revenues. We will allocate these commissions to Royalties and Basic Service Charges in equal proportions. Under another type of arrangement, you will offer rooms for sale through an electronic distribution channel at your best commissionable rate. The distribution channel will not mark-up these rates but will charge you a commission of up to 15% on consumed room nights.

The "property to property" incentive sales commission is 5% of the Gross Room Revenues generated from each reservation originated by another Chain Facility through the Central Reservation System. You will receive an incentive commission equal to 5% of the Gross Room Revenues generated by a reservation originated through the Facility's Reservation System terminal. We may establish rules and procedures for this program in the Manuals. Your incentive commissions are payable monthly in arrears. We may use your incentive commission payments to offset amounts you owe us for Recurring Fees and other charges, or owe our

34

Affiliates for other fees and charges.

We or an affiliate may charge you a commission of up to 10% of the Gross Room Revenues generated from consumed reservations booked by members of affinity groups and organizations participating in our Member Benefits sales program. We or our affiliate usually pays a portion of this commission to the affinity group or organization in exchange for promoting the Member Benefits program to its members.

E.      Guest Services Assessment

We will contact you if we receive any guest complaint about you or the Facility, and you will be responsible for resolving the complaint to the satisfaction of the guest. If you do not respond to any complaint within 7 business days after we refer it to you and the guest contacts us again to seek resolution, we will charge you a "Guest Services Assessment" of $75.00, plus the costs we incur to settle the matter with the guest. In addition, if the number of guest complaints per 1,000 occupied roomnights about you or the Facility in a calendar year exceed the "Annual Facility Allotment" we establish with the approval of the Board of Directors of the Days Inn Franchise Advisory Association, Inc., we will charge you a "Processing Fee" of $25.00 for each additional complaint we receive during that year, regardless of whether you are able to resolve it to the guest's satisfaction. We may change or eliminate the Guest Services Assessment, the Processing Fee, the Annual Facility Allotment and/or the time for responding to or resolving a guest complaint on a Chain-wide basis at any time upon 30 days advance notice, with the approval of the Board. The Guest Services Assessment and the Processing Fee are intended only to reimburse us for the costs of complaint handling and are not intended as penalties or liquidated damages. All guest complaints remain subject to indemnification under this Agreement.

DAYEXCI
186207.2 Q3/05

## GUARANTY

To induce Days Inns Worldwide, Inc., its successors and assigns ("you") to sign the License Agreement (the "Agreement") with the party named as the "Licensee," to which this Guaranty is attached, the undersigned, jointly and severally ("we," "our" or "us"), irrevocably and unconditionally (i) warrant to you that Licensee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Licensee's obligations under the Agreement, including any amendments,  will be punctually paid and performed.

Upon default by Licensee and notice from you we will immediately make each payment and perform or cause Licensee to perform, each unpaid or unperformed obligation of Licensee under the Agreement.  Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Licensee, or settle, adjust or compromise any claims against Licensee.  We waive notice of amendment of the Agreement.   We acknowledge that Section 17 of the Agreement, including Remedies, Venue and Dispute  Resolution, and WAIVER OF JURY TRIAL, applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Licensee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one in the same instrument.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

WITNESSES:

_____

_____

_____

GUARANTORS:

_____ (Seal)
Shailesh Kumar

_____ (Seal)
Keith Parker

_____ (Seal)
Bhavika Patel

36

DAYEXCI
186207.2  Q3/05

# EXHIBIT B

## AMENDMENT TO LICENSE AGREEMENT

THIS "AMENDMENT" is made and entered into as of this $\underline{13^{th}}$ day of May, 2015, ("Amendment Date") by and between **DAYS INNS WORLDWIDE, INC.**, a Delaware corporation ("we", "us" or "our"), **KK SANKAR MAHADEV CORP.**, a **Missouri corporation** ("you", or "your"), and Shailesh Kumar, Keith Parker and Bhavika Patel (the "Guarantors"). This Amendment supplements that certain License Agreement dated January 5, 2006 (the "License Agreement"), relating to a license to operate a Days Inn® System Unit located at 7100 NE Pravin Road Kansas City, MO, designated as Unit # **17633-60576-01** (the "Facility"). To the extent of any conflict between the License Agreement and this Amendment, the Amendment shall control.

IN CONSIDERATION of the mutual agreements herein contained, and promises herein expressed, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged by the parties, it is agreed as follows:

1.   The License Agreement is hereby amended to add the following Section 18.9:

*18.9.*   **Combined Fees.**  Notwithstanding Section 7.1 and 18.4, you will pay a Combined Fee consisting of the Royalty and System Assessment Fee at the rates set forth in this Section.  The Combined Fee excludes commissions and related service charges, guest complaint assessments, Internet and GDS Fees, the Loyalty Program Charge and other similar fees and charges described on Schedule C which must be paid as stated in this Agreement.

18.9.1  The Combined Fee shall be six and eight tenths percent **(6.8%)** of Gross Room Revenues commencing on the Amendment Date and accruing through the second (2nd) anniversary of the Amendment Date; and

18.9.2 The Combined Fee shall be seven and eight tenths percent **(7.8%)** of Gross Room Revenues commencing on the 2nd anniversary of the Amendment Date and accruing through the third (3rd) anniversary of the Amendment Date; and

18.9.3 The Royalty and System Assessment Fees shall be computed and paid at the rates specified in Section 7.1 on Gross Room Revenues accruing after the 3rd anniversary of the Amendment Date through the term of the License Agreement.

18.9.4   The rate changes set forth in this Section automatically terminate without notice or opportunity to cure, and the Royalty and System Assessment Fees shall reset to the rates specified in Section 7, if and as of the date (i) a Termination occurs, or we send you a notice of default and you fail to cure the default within the time specified, if any, in the notice of default, or (ii) after you satisfy the Improvement Obligation, the Facility receives a quality assurance inspection score of less than 80% (or its then equivalent) and the Facility fails to achieve a quality assurance inspection score of more than 80%  in a re-inspection to be performed not less than 60 days after the initial inspection.

2.   <u>Confidentiality</u>. You acknowledge that the existence of this Amendment and the granting of the benefits herein are strictly confidential between us and you. Part of the consideration received by us for granting the benefits is your obligation to maintain confidentiality about this Amendment and its benefits. Therefore, you agree not to disclose to any person or entity the existence or subject matter of this Amendment, or the benefits granted hereunder, except under compulsion of law or to attorneys or accountants as needed for assistance with representation of or advice to you. Within your organization, information about this Amendment will be disclosed to agents, officers, affiliates and contractors on a "need to know" basis only. If you violate this confidentiality obligation, no further benefits will be available from that time and thereafter, to the extent that the benefits have not then been fully utilized upon written notice from us.

3.   <u>Release</u>. You and Guarantors, on behalf of yourselves, your partners, officers, employees, directors, shareholders, representatives, agents and your successors and assigns, hereby release and hold harmless us, our officers, employees, agents, directors, shareholders, representatives, affiliates, parent entities and subsidiaries (collectively, "Releasees") and the predecessors, successors and assigns of the Releasees, from any and all claims and causes of action whatsoever arising prior to and through the date of this Amendment relating to the offer, sale, administration, negotiation, default, and/or performance of the License Agreement for the Facility.

4.   Except as expressly stated in this Amendment, no further additions, modification or deletions to the License Agreement or the Guaranty Agreement are intended by the parties or made by this Amendment.

5.   <u>Execution in Counterparts</u>. To facilitate execution of this Amendment by geographically separated parties, this Amendment, and all other agreements and documents to be executed in connection herewith may be executed in as many counterparts as may be required; and it shall not be necessary that the signatures on behalf of each party appear on each counterpart; but it shall be sufficient that the signature on behalf of each party appear on one or more of the counterparts. All counterparts shall collectively constitute a single agreement. It shall not be necessary in making proof of this Amendment to produce or account for more than a number of counterparts containing the respective signatures on behalf of all the parties hereto. All facsimile executions shall be treated as originals for all purposes.

Remainder of page intentionally left blank

2

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date indicated above:

**DAYS INNS WORLDWIDE, INC.**

By: _____
     Michael Piccola, SVP

**KK SANKAR MAHADEV CORP**

By: _____
     **(Vice) President**

**GUARANTORS:**

By: _____
     Shailesh Kumar

By: _____
     Keith Parker

By: _____
     Bhavika Patel

3

# EXHIBIT C

## GUARANTY

To induce Days Inns Worldwide, Inc., its successors and assigns ("you") to sign the License Agreement (the "Agreement") with the party named as the "Licensee," to which this Guaranty is attached, the undersigned, jointly and severally ("we," "our" or "us"), irrevocably and unconditionally (i) warrant to you that Licensee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Licensee's obligations under the Agreement, including any amendments, will be punctually paid and performed.

Upon default by Licensee and notice from you we will immediately make each payment and perform or cause Licensee to perform, each unpaid or unperformed obligation of Licensee under the Agreement. Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Licensee, or settle, adjust or compromise any claims against Licensee. We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Remedies, Venue and Dispute Resolution, and WAIVER OF JURY TRIAL, applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Licensee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one in the same instrument.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

WITNESSES:                          GUARANTORS:

_____            _____ (Seal)
                                    Shailesh Kumar

_____            _____ (Seal)
                                    Keith Parker

_____            _____ (Seal)
                                    Bhavika Patel

36

DAYEXCI
186207.2  Q3/05

# EXHIBIT D

Be sure to sign up for the new SynXis Property Manager. You can get more information at 800-475-0115 option 2# or email SynXisMigration@wyn.com. More details about the system are available in the new Myportal site.

WHG Support: (888) 328-0000

---

**From:** Days Inn Of Kc [mailto:daysinnofkc@yahoo.com]
**Sent:** Friday, April 08, 2016 12:58 PM
**To:** Expedia Partner Central Team
**Cc:** Bennett, Tara; Olivo, Doreen; Mehrotra, Nikhil; La Manno, Rita; Maly, Mark; jmcdonald@travelodge.ca; Cannon, Bob; Dunwoody, Gayle
**Subject:** Hotel closed

To, All

Our hotel days inn near worlds of fun has closed its door for good please stop any future sell of rooms

If you have any questions please call me at 816-225-7553

Thank You
Sam Patel
Days inns of Kansas City

On Apr 8, 2016, at 5:55 AM, Expedia Partner Central Team <expedia@expediamail.com> wrote:



**Dear Partner,**



3

# EXHIBIT E



# WYNDHAM
## HOTEL GROUP

Compliance Department
22 Sylvan Way
Parsippany, New Jersey 07054
Ph (973) 753-6000  ●  fax (800) 880-9445

April 15, 2016

<u>**VIA 2 DAY DELIVERY METHOD**</u>

Mr. Shailesh Kumar
KK Shankar Mahadev Corporation
7100 NE Parvin Road
Kansas City, MO  64117

RE:    **ACKNOWLEDGEMENT OF TERMINATION** of the License for Days Inn® System
Unit #17633-60576-01 located in Kansas City, MO (the "Facility")

Dear Mr. Kumar:

Days Inns Worldwide, Inc. ("we" or "us") has received an email, dated April 8, 2016 (the "Termination Date"), in which Sam Patel advised us that the Facility has been permanently closed. Accordingly, we acknowledge that the License Agreement, dated January 5, 2006, as amended (the "Agreement"), between KK Sankar Mahadev Corporation ("you" or "your") and us has terminated, effective on the Termination Date.

Because the Agreement has terminated, you must pay us Liquidated Damages of $86,000.00, as specified in Section 18.7 of the Agreement.  You must also pay any outstanding Recurring Fees and any other fees and charges through the date you complete the de-identification of the Facility.  We estimate that, as of the Termination Date, you owe us $26,366.33 in such fees and charges.  Please pay us this amount within fourteen (14) days.  Please consider this letter to be a notice and demand for payment under any Guaranty of the Agreement, directed to your Guarantors.

The Agreement requires you to perform certain post-termination obligations.  In addition to other obligations specified in the Agreement, by no later than ten (10) days from the delivery date of this letter, you must (a) remove all signage and other items bearing the Days Inn Marks; (b) perform all post-termination obligations specified in the Systems Standards Manual; (c) change all signs, billboards, and listings in telephone directories, travel guides, hotel indexes and similar materials in which the Facility is identified as a Days Inn facility; and (d) remove the Days Inn Marks from any advertising or promotional activities on, around or directed towards the Facility, including any web sites, web pages or search engines.  You must cooperate fully with us regarding any post-termination inspections by us to verify that the Facility has been properly de-identified.  You must immediately return to us all training documents, operating manuals and other proprietary material.

     

      

Mr. Shailesh Kumar
April 15, 2016
Page Two

Please know that, because the Agreement has terminated, you also have lost the right to continue to use the seamless interface version of your property management system. You must now make arrangements with the software vendor for a new license to use the property management system. If the Facility has WynGuest system installed, please be advised that due to the termination you will have no functionality from the system. Should you wish to continue using an independent version of the software, please contact Sabre at 877-520-3646. If your property is planning to migrate to another property management system, please contact your provider to expedite the installation. If you would like to inquire about the data maintained in the system, please contact Hotel Technology Client Support at 506-646-2521 to obtain reporting of that data.

Should you have any questions regarding this matter, please contact Charlene Martin, Senior Manager of Settlements, at (973) 753-7602.

Sincerely,

Joe Maida
Director
Contracts Compliance

Enclosure

cc:     Keith Parker (Guarantor)
        Bhavika Patel (Guarantor)
        Patrick Breen
        Charlene Martin
        Robert Kolatac
        Suzanne Fenimore
        Michael Piccola

Report Date: 15-Apr-2016

# ITEMIZED STATEMENT

| As of Date (DD-MMM-YYYY) | : | 08-Apr-2016 |
|---|---|---|
| Customer No | : | 17633-60576-01-DAY |
| Category Set | : | |
| Category Group | : | |
| Group No | : | No Bankruptcy Sites |
| Bankruptcy | : | No |
| Disputed | : | Yes |
| Finance Charges Included | : | |
| As of Date | : | 08-Apr-2016 |

| Customer No | : | 17633-60576-01-DAY |
|---|---|---|
| Address | : | 7100 NE PARVIN RD,KANSAS CITY,MO,64117-1570,US |
| As of Date | : | 08-Apr-2016 |

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| NOV-2015 | 43403428 | 11/29/2015 | Accrual-1000A-ROYALTY FEE | · | 2,330.40 | 0.00 | 76.11 | 2,433.75 |
| | 43403429 | 11/29/2015 | Accrual-1800A-RESERVATION FEE | · | 1,048.68 | 0.00 | 37.23 | 1,102.16 |
| | 43403560 | 11/29/2015 | Accrual-1210A-MARKETING FEE | · | 582.60 | 0.00 | 20.68 | 612.31 |
| | | | Sub Total: | | 3,961.68 | 0.00 | 134.02 | 4,148.22 |
| DEC-2015 | 21413116 | 12/21/2015 | WYNREWARDS 5% | | 549.42 | 0.00 | 13.46 | 571.40 |
| | 21413156 | 12/21/2015 | WYNREWARDS BONUS | | 15.00 | 0.00 | 0.37 | 15.60 |
| | 31093741 | 12/20/2015 | Jul 2015 NT Audi | | 168.90 | 0.00 | 12.66 | 184.18 |
| | 43409606 | 12/30/2015 | 5034A-WYNGUEST SUBSCRIPTION | | 425.00 | 34.41 | 9.19 | 475.72 |
| | 43430416 | 12/30/2015 | Accrual-1000A-ROYALTY FEE | · | 2,576.16 | 0.00 | 51.52 | 2,667.61 |
| | 43430417 | 12/30/2015 | Accrual-1800A-RESERVATION FEE | · | 1,159.27 | 0.00 | 23.19 | 1,200.43 |
| | 43430880 | 12/30/2015 | Accrual-1210A-MARKETING FEE | · | 644.04 | 0.00 | 12.88 | 666.90 |
| | | | Sub Total: | | 5,537.79 | 34.41 | 123.27 | 5,781.84 |
| JAN-2016 | 1605103 | 01/13/2016 | GDS & INTERNET BKGS | | 155.40 | 0.00 | 2.02 | 159.83 |
| | 21417042 | 01/21/2016 | WR FREE ENROLLMENTS | | -25.56 | 0.00 | 0.00 | -25.56 |
| | 21417043 | 01/21/2016 | WYNREWARDS 5% | | 775.82 | 0.00 | 6.58 | 794.83 |
| | 21423149 | 01/21/2016 | WYNREWARDS BONUS | | 20.00 | 0.00 | 0.18 | 20.49 |
| | 21423150 | 01/21/2016 | WYNREWARDS BONUS | | 5.00 | 0.00 | 0.05 | 5.13 |
| | 21424182 | 01/21/2016 | WYNREWARDS GOFREECR | | -315.00 | 0.00 | -0.00 | -315.00 |
| | 43434750 | 01/30/2016 | 5034A-WYNGUEST SUBSCRIPTION | | 425.00 | 34.41 | 2.07 | 468.60 |
| | 43457289 | 01/30/2016 | Accrual-1000A-ROYALTY FEE | · | 1,834.40 | 0.00 | 8.25 | 1,871.08 |
| | 43457290 | 01/30/2016 | Accrual-1800A-RESERVATION FEE | · | 825.48 | 0.00 | 3.71 | 841.99 |
| | 43457291 | 01/30/2016 | Accrual-1210A-MARKETING FEE | · | 458.60 | 0.00 | 2.06 | 467.77 |
| | TA0605103 | 01/13/2016 | T/A COMMISSIONS | | 4.68 | 0.00 | 0.06 | 4.81 |
| | TM0605103 | 01/13/2016 | MEMBER BENEFIT COMM | | 86.34 | 0.00 | 1.12 | 88.80 |
| | | | Sub Total: | | 4,250.16 | 34.41 | 26.50 | 4,382.76 |
| FEB-2016 | 104639 | 02/28/2016 | RETRAINFEE-FEB2016-4 | | 250.00 | 0.00 | 0.00 | 251.38 |

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| | 1612754 | 02/23/2016 | GDS & INTERNET BKGS | | 268.40 | 0.00 | 0.00 | 270.55 |
| | 21426025 | 02/21/2016 | WYNREWARDS 5% | | 591.82 | 0.00 | 0.00 | 597.15 |
| | 21427253 | 02/21/2016 | WR FREE ENROLLMENTS | | -3.00 | 0.00 | 0.00 | -3.00 |
| | 21430071 | 02/21/2016 | WYNREWARDS GOFREECR | | -63.00 | 0.00 | 0.00 | -63.00 |
| | 21432494 | 02/21/2016 | WYNREWARDS BONUS | | 10.00 | 0.00 | 0.00 | 10.09 |
| | 21432495 | 02/21/2016 | WYNREWARDS BONUS | | 5.00 | 0.00 | 0.00 | 5.05 |
| | 31112849 | 02/08/2016 | WYNREWARDS ADMINFEE | | 50.00 | 0.00 | 0.00 | 50.78 |
| | 31118413 | 02/28/2016 | Original chg Feb 16 | | 50.00 | 0.00 | 0.00 | -50.00 |
| | 43466801 | 02/28/2016 | 5034-WYNGUEST SUBSCRIPTION | | -425.00 | 0.00 | 0.00 | -461.94 |
| | 43464392 | 02/28/2016 | Accrual-1000A-ROYALTY FEE | • | 1,819.20 | 34.41 | 0.00 | 1,829.31 |
| | 43484547 | 02/28/2016 | Accrual-1800A-RESERVATION FEE | • | 818.64 | 0.00 | 0.00 | 823.14 |
| | 43484548 | 02/28/2016 | Accrual-1210A-MARKETING FEE | • | 454.80 | 0.00 | 0.00 | 457.30 |
| | TA0612754 | 02/23/2016 | T/A COMMISSIONS | | 31.04 | 0.00 | 0.00 | 31.29 |
| | TM0612754 | 02/23/2016 | MEMBER BENEFIT COMM | | 33.18 | 0.00 | 0.00 | 33.45 |
| | TR0612754 | 02/23/2016 | TMG / CONSORTIA | | 5.65 | 0.00 | 0.00 | 5.70 |
| | | | **Sub Total:** | | 4,646.73 | 34.41 | 0.00 | 4,711.03 |
| MAR-2016 | 1619480 | 03/16/2016 | GDS & INTERNET BKGS | | 28.75 | 0.00 | 0.00 | 28.75 |
| | 21432576 | 03/21/2016 | WYNREWARDS GOFREECR | | -94.50 | 0.00 | 0.00 | -94.50 |
| | 21432509 | 03/21/2016 | WYNREWARDS BONUS | | 10.00 | 0.00 | 0.00 | 10.00 |
| | 21440723 | 03/21/2016 | WR FREE ENROLLMENTS | | -22.10 | 0.00 | 0.00 | -22.10 |
| | 21440724 | 03/21/2016 | WYNREWARDS 5% | | 579.71 | 0.00 | 0.00 | 579.71 |
| | 31126326 | 03/09/2016 | OMEGA PROGRAM | | 5.00 | 0.26 | 0.00 | 5.26 |
| | 31132593 | 03/29/2016 | NT AUDIT VAR FUND | | 577.21 | 0.00 | 0.00 | 577.21 |
| | 31132606 | 03/29/2016 | NT AUDIT VAR ROYALTY | | 824.58 | 0.00 | 0.00 | 824.58 |
| | 43489762 | 03/30/2016 | 5034-WYNGUEST SUBSCRIPTION | | 425.00 | 34.41 | 0.00 | 459.41 |
| | 43509670 | 03/30/2016 | Accrual-1000A-ROYALTY FEE | • | 2,115.84 | 0.00 | 0.00 | 2,113.84 |
| | 43509671 | 03/30/2016 | Accrual-1800A-RESERVATION FEE | • | 951.23 | 0.00 | 0.00 | 951.23 |
| | 43509676 | 03/30/2016 | Accrual-1210A-MARKETING FEE | • | 528.46 | 0.00 | 0.00 | 528.46 |
| | TA0619480 | 03/16/2016 | T/A COMMISSIONS | | 4.28 | 0.00 | 0.00 | 4.28 |
| | TM0619480 | 03/16/2016 | MEMBER BENEFIT COMM | | 9.66 | 0.00 | 0.00 | 9.66 |
| | | | **Sub Total:** | | 5,941.12 | 34.67 | 0.00 | 5,975.79 |
| APR-2016 | 10876253 | 04/06/2016 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 0.00 | 160.00 |
| | 10876539 | 04/06/2016 | WR GUEST SATISFACTION | | 57.69 | 0.00 | 0.00 | 57.69 |
| | 31136451 | 04/05/2016 | GLOBAL CONFERENCE | | 1,149.00 | 0.00 | 0.00 | 1,149.00 |
| | | | **Sub Total:** | | 1,366.69 | 0.00 | 0.00 | 1,366.69 |
| | | | **Grand Total:** | | 25,704.17 | 137.90 | 283.79 | 26,366.33 |

Requested By:  Patrick Yeu

* Please note the accruals on your account are estimates.

Page 3 of 3

Make sure to promptly submit your actual gross room revenue and rooms sold.

## DE-IDENTIFICATION PROCEDURES

**You must complete each of the following immediately:**

1.  Remove, replace or cover with an opaque cover the primary Facility signage and all other exterior signage bearing the Days Inn Marks.

2.  Remove all interior signage that contains Days Inn Marks.

3.  Change advertising billboards to remove Days Inn Marks, including any department of transportation or other highway signage.

4.  Stop answering Facility telephone as a Days Inn facility.

5.  Remove Days Inn name and Marks from any domain name, advertising and brochures.

6.  Return to us or destroy all confidential operations and training manuals.

7.  Remove the Days Inn name and Marks from the following items:

    - Guestroom supplies including door signage, ice buckets, cups etc.
    - Bathroom supplies including soap, shampoo, conditioner, etc.
    - Business cards and letterhead
    - Registration cards, folios, guest receipts, including electronic copies
    - Guestroom keys
    - Uniforms and name badges

8.  Paint over or remove any distinctive Days Inn trade dress, paint schemes or architectural features.

9.  Remove Days Inn name from the Facility's listing on TripAdvisor or any other online traveler review site.

10. It is prohibited to re-name the Facility with a confusingly similar name or color scheme as a Days Inn facility.

11. We will visit the Facility at any time after 10 days after the Termination Date to verify that you have performed these de-identification obligations.

   Shipment Receipt

**Transaction Date: 15 Apr 2016**     **Tracking Number:**     1Z22445X0293041116

---

**1  Address Information**

| Ship To: | Ship From: | Return Address: |
|---|---|---|
| KK Shankar Mahadev Corporation | Wyndham Hotel Group - 22 Sylvan | Wyndham Hotel Group - 22 Sylvan |
| Shailesh Kumar | Patrick Yeu | Patrick Yeu |
| 7100 NE Parvin Road | 22 Sylvan Way | 22 Sylvan Way |
| KANSAS CITY MO 641171570 | Parsippany NJ 07054 | Parsippany NJ 07054 |
|  | Telephone:973-753-7831 | Telephone:973-753-7831 |

---

**2  Package Information**

| Weight | Dimensions / Packaging | Declared Value | Reference Numbers |
|---|---|---|---|
| 1. Letter (Letter billable) | UPS Letter |  | Reference # 1 - 006-1696 |

---

**3  UPS Shipping Service and Shipping Options**

| Service: | UPS 2nd Day Air |
|---|---|
| Guaranteed By: | End of Day Tuesday, Apr 19, 2016 |
| Shipping Fees Subtotal: | 22.94 USD |
| Transportation | 22.44 USD |
| Fuel Surcharge | 0.50 USD |

---

**4  Payment Information**

Bill Shipping Charges to:          Shipper's Account 22445X

| Charges: | 22.94 USD |
|---|---|
| **A discount has been applied to the Daily rates for this shipment** |  |
| Negotiated Charges: | 7.30 USD |
| Total Charges: | 7.30 USD |

---

Note: Your invoice may vary from the displayed reference rates.

* For delivery and guarantee information, see the UPS Service Guide. To speak to a customer service representative, call 1-800-PICK-UPS for domestic services and 1-800-782-7892 for international services.